[No. S123659. June 29, 2006.]

BIG CREEK LUMBER CO. et al., Plaintiffs and Appellants, v.
COUNTY OF SANTA CRUZ et al., Defendants and Appellants.

1140

**COUNSEL**

Jones Day, Craig E. Stewart, Tracy M. Strong; Law Offices of Dennis J. Kehoe and Dennis J. Kehoe for Plaintiff and Appellant Big Creek Lumber Company.

Bosso, Williams, Sachs, Atack & Gallagher, Bosso, Williams, Sachs, Atack, Gallagher & Sanford, Bosso Williams, Robert E. Bosso and Catherine A. Phillipovitch for Plaintiff and Appellant Central Coast Forest Association.

Bruce A. Crane and Ginevra K. Chandler for California Board of Forestry and Fire Protection as Amicus Curiae on behalf of Plaintiff and Appellant Big Creek Lumber Company.

Pacific Legal Foundation, Robin L. Rivett and M. Reed Hopper for Forest Landowners of California, California Forestry Association, California Farm Bureau Federation and California Cattlemen's Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Dana McRae, County Counsel; Shute, Mihaly & Weinberger, Fran M. Layton, Catherine C. Engberg, Jenny K. Harbine, Gabriel M. B. Ross, Susannah T. French and Marlena G. Byrne for Defendant and Appellant County of Santa Cruz.

Bill Lockyer, Attorney General, Richard M. Frank and Tom Greene, Chief Assistant Attorneys General, J. Matthew Rodriguez, Assistant Attorney General, and Tara L. Mueller, Deputy Attorney General, for Defendant and Appellant California Coastal Commission.

Orrick, Herrington & Sutcliffe, Karen Johnson-McKewan, Joshua Walker, Robert Nagel and Katherine Ikeda for the Committee for Green Foothills, Citizens for Responsible Forest Management, the Planning and Conservation League, the Lompico Watershed Conservancy and the Sierra Club as Amici Curiae on behalf of Defendant and Appellant County of Santa Cruz.

Thomas F. Casey III, County Counsel (San Mateo) and Kimberly A. Marlow, Deputy County Counsel, for County of San Mateo as Amicus Curiae on behalf of Defendant and Appellant County of Santa Cruz.

Dennis J. Herrera, City Attorney (San Francisco), Burk E. Delventhal and Wayne Snodgrass, Deputy City Attorneys, for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Defendant and Appellant County of Santa Cruz.

## OPINION

**WERDEGAR, J.**—We must decide whether two county zoning ordinances relating to the permissible locations for timber operations are preempted by state forestry statutes. Concluding they are not, we reverse the judgment of the Court of Appeal.

### *Background*

In 1999, the Board of Supervisors of the County of Santa Cruz (County) adopted several ordinances that would have affected timber harvesting operations in the County. As pertinent here, County's ordinances restricted timber harvesting to specified zone districts within the County (Santa Cruz County Res. No. 493-99 & Santa Cruz County Ord. No. 4577 (1999); hereafter the zone district ordinance), barred timber harvesting operations in certain areas adjacent to streams and residences (Santa Cruz County Ord. No. 4571 (1999); hereafter the stream ordinance), and limited the parcels on which helicopter operations associated with such harvesting could occur (Santa Cruz County Ord. No. 4572 (1999); hereafter the helicopter ordinance). County also requested and obtained from the California Coastal Commission a ruling certifying the zone district ordinance as an amendment to County's local coastal program.

Plaintiffs Big Creek Lumber Co. and Homer T. McCrary (jointly Big Creek) and the Central Coast Forest Association, a nonprofit association of landowners and forestry professionals in the County, filed a petition for writ

of mandate against County and the California Coastal Commission, challenging County's timber-related ordinances and the Commission's certification of the zone district ordinance as a local coastal program amendment. Plaintiffs' petition alleged that County's and the California Coastal Commission's actions violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) and County's ordinances violated the doctrine of preemption.

The preemption claim was bifurcated and heard separately. The trial court found in favor of plaintiffs except as to the zone district ordinance. On appeal, the Court of Appeal invalidated County's ordinances in their entirety. We granted County's petition for review of the Court of Appeal's invalidation of the helicopter and zone district ordinances.[1]

### Discussion

The zone district ordinance amends County's zoning laws to restrict timber harvesting operations to areas zoned for timber production, mineral extraction industrial, or parks, recreation and open space. The helicopter ordinance requires that helicopter staging, loading, and servicing facilities associated with timber operations be located either on a parcel of land zoned for timber harvesting or on a parcel adjacent to such, and within the boundaries of a timber harvesting plan that has been approved by the California Department of Forestry and Fire Protection.

Plaintiffs argue that the ordinances are preempted by the Z'berg-Nejedly Forest Practice Act of 1973 (FPA) (Pub. Resources Code, § 4511 et seq.)[2] and the California Timberland Productivity Act of 1982 (TPA) (Gov. Code, § 51100 et seq.). For the following reasons, we conclude that County's ordinances are not preempted.

A. *Overview: State Forestry Law*

1. *The Forest Practice Act*

"Timber harvesting operations in this state must be conducted in accordance with the provisions of the Forest Practice Act. The Act was intended to create and maintain a comprehensive system for regulating timber harvesting

---

[1] Thus, the stream ordinance, which would have established a riparian no-harvesting buffer zone around certain stream channels, is not at issue.

[2] Except where otherwise noted, unlabeled section references are to the Public Resources Code.

in order to achieve two goals" (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1226 [32 Cal.Rptr.2d 19, 876 P.2d 505]): to restore, enhance, and maintain the productivity of timberlands where feasible; and to achieve the maximum sustained production of high quality timber products, while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment (*ibid.*; see § 4513).

As originally enacted in 1973, the FPA permitted individual counties to adopt stricter rules and regulations governing timber operations than those provided under the FPA. (Stats. 1973, ch. 880, § 4, pp. 1615–1616 [adding former § 4516].) In 1982, the Legislature amended the FPA (Stats. 1982, ch. 1561, § 3, pp. 6164–6166) to provide instead that counties may recommend to the California Board of Forestry and Fire Protection (Board) additional forest practice rules and regulations (§ 4516.5, subds. (a), (b)) but, except with respect to performance bonds or other surety for road protection, counties are forbidden to "regulate the conduct of timber operations" (§ 4516.5, subd. (d); hereafter section 4516.5(d)).[3]

Pursuant to the FPA, "timber operations are controlled by means of a site-specific timber harvesting plan that must be submitted to the [state forestry] department before timber operations may commence.[4] (§§ 4581 and 4582.5.) The Legislature has specified that the plan include the name and address of the timber owner and the timber operator, a description of the land upon which the work is proposed to be done, a description of the silviculture methods to be applied, an outline of the methods to mitigate erosion caused by operations performed in the vicinity of a stream, the provisions, if any, to protect any 'unique area' within the area of operations, and the anticipated dates for commencement and completion of operations. (§ 4582, subds. (a)–(g).)" (*Sierra Club v. State Bd. of Forestry, supra,* 7 Cal.4th at p. 1226.) The director of the state forestry department, and the Board on appeal, review timber harvesting plans for compliance with the FPA and applicable regulations. (§ 4582.7.)

---

[3] In its entirety, section 4516.5(d) states: "Except as provided in subdivision (e) [Board may delegate to individual counties authority to require surety for road protection], individual counties shall not otherwise regulate the conduct of timber operations, as defined by this chapter, or require the issuance of any permit or license for those operations." Section 4516.5(d) does not apply to parcels smaller than three acres not zoned as timberland production. (§ 4516.5, subd. (f).)

[4] The FPA defines "timber operations" as "the cutting or removal or both of timber . . . from timberlands for commercial purposes, together with all the work incidental thereto, . . . but excluding preparatory work such as treemarking, surveying, or roadflagging." (§ 4527; see also § 4516.5, subd. (a).)

### 2. The Timberland Productivity Act

The TPA, as amended in 1982 (Stats. 1982, ch. 1489, §§ 1–39, pp. 5748–5766), reflects state policy, inter alia, "that timber operations conducted in a manner consistent with forest practice rules adopted by the [Board] shall not be or become restricted or prohibited due to any land use in or around the locality of those operations." (Gov. Code, § 51102, subd. (b).)[5] The TPA seeks to implement that policy "by including all qualifying timberland in timberland production zones." (*Id.*, § 51103.) "Timberland," the Legislature has stated, "means privately owned land, or land acquired for state forest purposes, which is devoted to and used for growing and harvesting timber, or for growing and harvesting timber and compatible uses, and which is capable of growing an average annual volume of wood fiber of at least 15 cubic feet per acre." (*Id.*, § 51104, subd. (f).)

In order to accomplish its purposes, the TPA relies on tax incentives and zoning mandates. The TPA restricts land in certain timberland production zones (TPZ's) to the growing and harvesting of timber and compatible uses. (See Gov. Code, §§ 51115, 51118.) In exchange, owners of land in a TPZ benefit by lower property tax valuations that reflect the enforceable statutory restrictions. (See Cal. Const., art. XIII, § 8 [Legislature may tax certain land consistently with use restrictions].)

The TPA's predecessor statute (Stats. 1976, ch. 176, § 4.5, p. 305) dictated "timberland preserve" zoning for certain "list A" parcels that were assessed for growing and harvesting timber as the highest and best use. (Gov. Code, § 51110.) Exceptions to mandatory zoning of list A properties were permitted where a parcel in fact was not used for timber growing and harvesting, or where the owner contested the zoning and local officials found exclusion to be in the public interest. (Gov. Code, § 51112, subds. (a), (b).) Timberland preserve zoning also was dictated for certain other timberlands, called "list B" parcels, that were not at that time assessed for growing and harvesting

---

[5] Government Code section 51102 in its entirety states: "(a) The Legislature further declares that to fully realize the productive potential of the forest resources and timberlands of the state, and to provide a favorable climate for long-term investment in forest resources, it is the policy of this state to do all of the following: [¶] (1) Maintain the optimum amount of the limited supply of timberland to ensure its current and continued availability for the growing and harvesting of timber and compatible uses. [¶] (2) Discourage premature or unnecessary conversion of timberland to urban and other uses. [¶] (3) Discourage expansion of urban services into timberland. [¶] (4) Encourage investment in timberlands based on reasonable expectation of harvest. [¶] (b) The Legislature further declares that it is the policy of this state that timber operations conducted in a manner consistent with forest practice rules adopted by the State Board of Forestry and Fire Protection shall not be or become restricted or prohibited due to any land use in or around the locality of those operations."

timber as the highest and best use. (Gov. Code, § 51110.1.)[6] Exceptions to mandatory zoning of list B properties were permitted only where local officials found exclusion to be in the public interest. (Gov. Code, § 51112, subd. (c).) Initial determinations as to parcels' placement on list A and list B were to have been completed by 1978. (*Id.,* subds. (a), (b), (c).)

Since 1978, additional timberland production zoning has been initiated by petition of the property owner. (Gov. Code, § 51113.) The TPA also provides for rezoning and for removal of parcels from timberland production zoning. (See *id.,* §§ 51120–51146.)

### B. *Preemption Principles*

■ The party claiming that general state law preempts a local ordinance has the burden of demonstrating preemption. (See, e.g., *Kucera v. Lizza* (1997) 59 Cal.App.4th 1141, 1153 [69 Cal.Rptr.2d 582].) We have been particularly "reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another." (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 707 [209 Cal.Rptr. 682, 693 P.2d 261]; see also *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853, 866–867 [118 Cal.Rptr.2d 746, 44 P.3d 120].) "The common thread of the cases is that if there is a significant local interest to be served which may differ from one locality to another then the presumption favors the validity of the local ordinance against an attack of state preemption." (*Gluck v. City of Los Angeles* (1979) 93 Cal.App.3d 121, 133 [155 Cal.Rptr. 435], citing, inter alia, *Galvan v. Superior Court* (1969) 70 Cal.2d 851, 862–864 [76 Cal.Rptr. 642, 452 P.2d 930].)

■ Thus, when local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute. (See *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 93 [2 Cal.Rptr.2d 513, 820 P.2d 1023].) The presumption against preemption accords with our more general understanding that "it is not to be presumed that the legislature in the enactment of statutes intends to overthrow long-established principles of law unless such intention is made clearly to appear

---

[6] The "timberland preserve" designation was altered to "timberland *production*" in 1984. (Stats. 1984, ch. 678, § 3, pp. 2497–2498, italics added.)

either by express declaration or by necessary implication." (*County of Los Angeles v. Frisbie* (1942) 19 Cal.2d 634, 644 [122 P.2d 526]; accord, *People v. Davenport* (1985) 41 Cal.3d 247, 266 [221 Cal.Rptr. 794, 710 P.2d 861]; *Theodor v. Superior Court* (1972) 8 Cal.3d 77, 92 [104 Cal.Rptr. 226, 501 P.2d 234].)[7]

■ Moreover, the "general principles governing state statutory preemption of local land use regulation are well settled. 'The Legislature has specified certain minimum standards for local zoning regulations (Gov. Code, § 65850 et seq.)' even though it also 'has carefully expressed its intent to retain the maximum degree of local control (see, e.g., *id.,* §§ 65800, 65802).' (*IT Corp. v. Solano County Bd. of Supervisors*[, *supra*,] 1 Cal.4th [at p.] 89.) ■ 'A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations *not in conflict with general laws.*' (Cal. Const., art. XI, § 7, italics added.) ' "Local legislation in conflict with general law is void. Conflicts exist if the ordinance duplicates [citations], contradicts [citation], or enters an area fully occupied by general law, either expressly or by legislative implication [citations]." ' " (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 747 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

Local legislation is "duplicative" of general law when it is coextensive therewith and "contradictory" to general law when it is inimical thereto. Local legislation enters an area "fully occupied" by general law when the Legislature has expressly manifested its intent to fully occupy the area or when it has impliedly done so in light of recognized indicia of intent. (*Great Western Shows, Inc. v. County of Los Angeles, supra,* 27 Cal.4th at pp. 860–861.)

### C. *The Zone District Ordinance*

■ Plaintiffs contend the zone district ordinance is preempted by section 4516.5(d) of the FPA. With exceptions not relevant here, section 4516.5(d)

---

[7] An analogous presumption against preemption is well established in federal law, in that "[t]he party who claims that a state statute is preempted by federal law bears the burden of demonstrating preemption. [Citation.] An important corollary of this rule, often noted and applied by the United States Supreme Court, is that '[w]*hen Congress legislates in a field traditionally occupied by the States, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." ' " (Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 956–957 [17 Cal.Rptr.3d 180, 95 P.3d 422], citing numerous authorities and quoting *California v. ARC America Corp.* (1989) 490 U.S. 93, 101 [104 L.Ed.2d 86, 109 S.Ct. 1661].) The high court has acknowledged, moreover, that this "presumption applies both to the existence of preemption and to the scope of preemption." (*Bronco Wine Co. v. Jolly,* at p. 957, citing *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240].)

provides that individual counties shall not "regulate the conduct of timber operations . . . or require the issuance of any permit or license for those operations." As neither ordinance at issue requires the issuance of any permit or license, this case concerns the import of the statutory phrase "conduct of timber operations."

In *Big Creek Lumber Co. v. County of San Mateo* (1995) 31 Cal.App.4th 418, 428 [37 Cal.Rptr.2d 159] (*Big Creek v. San Mateo*), the Court of Appeal held that section 4516.5(d) does not deprive California counties of authority to zone timberland outside TPZ's for uses other than timber production. The Court of Appeal acknowledged that section 4516.5(d) mandates that the "conduct" of timber harvesting operations be governed exclusively by state law, but held that San Mateo County's ordinance, which restricted the location of non-TPZ commercial timber harvesting, did not offend the statute because it spoke "not to *how* timber operations may be conducted, but rather [to] *where* they may take place." (*Big Creek v. San Mateo,* at pp. 424–425.) The court also noted that numerous provisions of California forestry law reveal the Legislature's intention to preserve local zoning authority. (See *id.* at pp. 425–426, citing statutes.) Harmonizing the FPA and the TPA, the court concluded that "the Legislature did not intend to preclude counties from using their zoning authority to prohibit timber cutting on lands outside the TPZ's." (*Id.* at p. 426.) For the following reasons, we agree.

### 1. *Traditional local zoning power*

■ Land use regulation in California historically has been a function of local government under the grant of police power contained in article XI, section 7 of the California Constitution.[8] "We have recognized that a city's or county's power to control its own land use decisions derives from this inherent police power, not from the delegation of authority by the state." (*Devita v. County of Napa* (1995) 9 Cal.4th 763, 782 [38 Cal.Rptr.2d 699, 889 P.2d 1019].) And the Legislature, when enacting state zoning laws, has declared its " 'intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters.' " (*Ibid.*, quoting Gov. Code, § 65800.)[9]

---

[8] Article XI, section 7 of the California Constitution provides in its entirety: "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."

[9] Government Code section 65800 provides in its entirety: "It is the purpose of this chapter [i.e., chapter 4, Zoning Regulations] to provide for the adoption and administration of zoning laws, ordinances, rules and regulations by counties and cities, as well as to implement such general plan as may be in effect in any such county or city. Except as provided in Article 4 (commencing with Section 65910 [open-space zoning ordinance] and in Section 65913.1 [zoning sufficient land for residential use] the Legislature declares that in enacting this chapter

Thus, "[t]he power of cities and counties to zone land use in accordance with local conditions is well entrenched." (*IT Corp. v. Solano County Bd. of Supervisors, supra,* 1 Cal.4th at p. 89.) ■ "In enacting zoning ordinances, the municipality performs a legislative function, and every intendment is in favor of the validity of such ordinances." (*Lockard v. City of Los Angeles* (1949) 33 Cal.2d 453, 460 [202 P.2d 38].)

### 2. *Express preemption*

In the FPA, the Legislature directed the Board to divide the state into districts (§ 4531) and adopt "forest practice rules and regulations" for each district (§ 4551).[10] No timber operations may be conducted without submission of a timber harvesting plan and approval by the Director of Forestry and Fire Protection or by the Board on appeal. (§§ 4581–4582, 4582.7; see generally *Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 424.) And, as noted, while individual counties may recommend regulations to the Board (§ 4516.5, subd. (a)), they may not regulate the conduct of timber operations (§ 4516.5(d)). The question of express preemption turns on whether the field the Legislature has occupied in so providing encompasses the County's zone district ordinance. (See *Morehart v. County of Santa Barbara, supra,* 7 Cal.4th at p. 748.) Our primary task when interpreting a statute is to determine the Legislature's intent. (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) We turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent. (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

Section 4516.5(d) contains no express reference to "zoning," nor does it bar localities in terms from regulating the location of timber operations. Rather, counties are forbidden to "regulate the conduct" of timber operations. As the court in *Big Creek v. San Mateo* pointed out, in common parlance an ordinance that avoids speaking to *how* timber operations may be conducted and addresses only *where* they may take place falls short of being

---

it is its intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters."

[10] Such rules and regulations "apply to the conduct of timber operations and shall include, but shall not be limited to, measures for fire prevention and control, for soil erosion control, for site preparation that involves disturbance of soil or burning of vegetation following timber harvesting activities conducted after January 1, 1988, for water quality and watershed control, for flood control, for stocking, for protection against timber operations which unnecessarily destroy young timber growth or timber productivity of the soil, for prevention and control of damage by forest insects, pests, and disease, for the protection of natural and scenic qualities in special treatment areas . . . and for the preparation of timber harvesting plans." (§ 4551.5.)

"a clear attempt to regulate the conduct" thereof. (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 424; cf. *Desert Turf Club v. Board of Supervisors* (1956) 141 Cal.App.2d 446, 452 [296 P.2d 882] [that state has occupied field of horse racing regulation does not deprive county of right to adopt zoning restrictions on placement of racetracks].) Nevertheless, as the Court of Appeal below recognized, to the extent zoning by definition may have the consequence of excluding logging from some locations, it may in that sense be said to "regulate" that activity, at least in the excluded locations.

When as here a statute is susceptible to more than one reasonable interpretation, "we look to 'extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " (*Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519 [106 Cal.Rptr.2d 548, 22 P.3d 324]; see also *IT Corp. v. Solano County Bd. of Supervisors, supra,* 1 Cal.4th at p. 98.) In this case, such indicia support the construction of section 4516.5(d) adopted by the Court of Appeal in *Big Creek v. San Mateo, supra,* 31 Cal.App.4th 418.

First, in many places where it addresses timberland zoning, general state forestry law expressly preserves and plainly contemplates the exercise of local authority. The actual designation of TPZ's, for example, is left to local action. (Gov. Code, § 51104, subds. (a), (c), (g); see, e.g., *id.,* §§ 51112 [on or before March 1, 1977 (list A); on or before March 1, 1978 (list B)] and 51113 [current].) Owners of parcels desiring TPZ zoning must petition local authorities. (*Id.,* § 51113, subd. (a)(1).) If the parcel does not meet state timber stocking standards and forest practice rules, the owner must agree to do so within five years (*id.,* subd. (c)(3)(A)), and, if the owner fails to do so, local authorities are empowered to rezone the parcel (*ibid.*) and to "specify a new zone for the parcel, which is in conformance with the county general plan and whose primary use is other than timberland" (*id.,* subd. (c)(3)(B)). Additionally, local bodies are authorized in certain circumstances to rezone TPZ parcels (Gov. Code, § 51120, subd. (c)) or convert them to another use (*id.,* § 51133, subd. (b)).

"Thus, it is clear that the Legislature has deferred a number of important zoning decisions to local authority, even in the case of TPZ's." (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 425.) Certainly neither the TPA nor the FPA suggests localities are restricted in what uses they may prohibit outside TPZ zones. (*Big Creek v. San Mateo,* at p. 428.) "Nowhere in the statutory scheme," in fact, "has the Legislature expressly prohibited the use of zoning ordinances" (*id.* at p. 425).

Second, section 4516.5(d)'s terminology is not "so overshadowing that it obliterates all vestiges of local power as to a subject where municipalities have traditionally enjoyed a broad measure of autonomy." (*Waste Resource Technologies v. Department of Public Health* (1994) 23 Cal.App.4th 299, 306 [28 Cal.Rptr.2d 422] [discussing authority to grant refuse disposal permits].) That the Legislature intended the phrase "regulate the conduct" in section 4516.5(d) to preclude only local regulations that affect *how* timber operations are conducted is borne out by the kinds of issues the Board, under the rubric of "the conduct of timber operations," is in its rules and regulations statutorily required to address. (See § 4551.5.) Fire prevention and control, soil erosion control, site preparation, water quality and watershed control, flood control, disease prevention and control (*ibid.*)—these clearly are matters relating to the process of carrying out timber operations. (See *Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 426.)

Third, the legislative history of the FPA does not support plaintiffs' expansive reading of section 4516.5(d). Although plaintiff Big Creek suggests the Legislature's purpose was to substitute for local regulation procedures whereby the Board would adopt rules addressing local concerns, the available legislative history contains "no discussion of county zoning authority or its relation to regulation of the 'conduct' of logging operations." (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at pp. 426–427.)

Of greater import is that section 4516.5(d) was added to the FPA during the same legislative session in which the TPA was amended. (See Stats. 1982, ch. 1561, § 3, p. 6164 [adding § 4516.5] and *id.,* ch. 1489, §§ 1–39, pp. 5748–5766.) That the Legislature would, in the same legislative session, include in one general forestry statute numerous provisions that rely upon local zoning authority (see, e.g., Gov. Code, §§ 51113, 51133, 51120) and when amending another general forestry statute forbid localities' exercise of such authority seems unlikely. (See *Garvey v. Byram* (1941) 18 Cal.2d 279, 282 [115 P.2d 501] [concerning reenactment of former Pol. Code, § 3817 with minor amendments during the same legislative session in which former Pol. Code, § 3834.25 was enacted]; *People v. Black* (1982) 32 Cal.3d 1, 7–8 [184 Cal.Rptr. 454, 648 P.2d 104] [provisions relating to same subject enacted at same legislative session should be consistently construed].)

The history of the legislation that added section 4516.5(d) to the FPA confirms that one of its purposes was to influence local zoning agencies in the exercise of their authority. A TPZ designation puts county residents on notice that timber operations are expected to occur on the parcel (Gov. Code, § 51115.1, subd. (b)), inter alia to discourage expansion of urban services into timberland (*id.,* § 51102, subd. (a)(3)). By restricting timber harvesting to timberland production, mineral extraction industrial, and park, recreation and

open space zone districts, County's zone district ordinance encourages non-TPZ timberland owners who desire to harvest their timber to rezone their property to one of these permitted zone districts. This in turn advances the Legislature's objective of "including all qualifying timberland in timberland production zones" (*id.*, § 51103).

Fourth, construing section 4516.5(d) so as to encompass every local regulation of timber operations without regard to whether the regulation purports to control the process or manner of carrying out such operations would not account for the Legislature's having included the phrase "the conduct of" in the FPA's express preemption provision. As the United States Supreme Court has reminded us, " '*each phrase* within [an express preemption provision] limits the universe of [local action] pre-empted by the statute.' " (*Lorillard Tobacco Co. v. Reilly* (2001) 533 U.S. 525, 550–551 [150 L.Ed.2d 532, 121 S.Ct. 2404], italics added.) Plaintiffs' proposed reading of section 4516.5(d) would give the phrase "the conduct of" no limiting effect on the universe of local action preempted by that statute.

Plaintiffs' reading of section 4516.5(d) also would violate the fundamental rule that "[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage" (*Arnett v. Dal Cielo* (1996) 14 Cal.4th 4, 22 [56 Cal.Rptr.2d 706, 923 P.2d 1]). One effect of plaintiffs' reading would be to render the FPA's definition of "timberland" (see § 4526) partly surplusage. As previously noted, for the purposes of the FPA (with exceptions not pertinent), "timberland" means "land . . . which is available for, and capable of, growing a crop of trees of any commercial species used to produce lumber and other forest products" (*ibid.*). The phrase "available for" would be superfluous if the definition were read to include *any* land that is capable of growing qualified trees, but that is what plaintiffs implicitly urge by suggesting that section 4516.5(d) displaces counties' traditional power to declare which parcels among all those capable of growing trees are available for timbering.

When the Legislature wishes expressly to preempt all regulation of an activity, it knows how to do so. For example, the Legislature has provided in the TPA that "[p]arcels zoned as timberland production [i.e., located in TPZ's] shall be zoned so as to restrict their use to growing . . . timber and to compatible uses. *The growing and harvesting of timber on those parcels shall be regulated solely pursuant to state statutes and regulations.*" (Gov. Code, § 51115, italics added.) One implication of this provision, of course, is that the growing and harvesting of timber on non-TPZ parcels need not be regulated solely pursuant to state statutes and regulations.

Moreover, to read section 4516.5(d) as precluding all local zoning control over timber operations could lead to absurd results. Such a reading, for example, apparently would require cities and counties to allow commercial logging even in residential districts. Neither the language of the statute nor its legislative history supports such a reading. (See *Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 427.)

 The Legislature has had ample opportunity over the past decade to amend section 4516.5(d) to abrogate or modify the Court of Appeal's construction of the statutory phrase "regulate the conduct of timber operations" in *Big Creek v. San Mateo.* Yet, notwithstanding it has amended the FPA in numerous other particulars every year since that decision was filed, it has not done so. Several California judicial decisions, moreover, have relied on *Big Creek v. San Mateo* in the intervening years.[11] " 'Where a statute has been construed by judicial decision, and that construction is not altered by subsequent legislation, it must be presumed that the Legislature is aware of the judicial construction and approves of it.' " (*Wilkoff v. Superior Court* (1985) 38 Cal.3d 345, 353 [211 Cal.Rptr. 742, 696 P.2d 134].) The Legislature's failure to amend section 4516.5(d), while not conclusive, "may be presumed to signify legislative acquiescence" in the *Big Creek v. San Mateo* decision. (*People v. Leahy* (1994) 8 Cal.4th 587, 604 [34 Cal.Rptr.2d 663, 882 P.2d 321], citing numerous authorities.)[12]

---

[11] See *City of Malibu v. Santa Monica Mts. Conservancy* (2002) 98 Cal.App.4th 1379, 1384–1385 [119 Cal.Rptr.2d 777] (comprehensive zoning is legitimate exercise of local government's police power); *Placer Ranch Partners v. County of Placer* (2001) 91 Cal.App.4th 1336, 1341 [111 Cal.Rptr.2d 577] (zoning "buffers are among the tools counties may use in the interest of sound community planning"); *Burchett v. City of Newport Beach* (1995) 33 Cal.App.4th 1472, 1482 [40 Cal.Rptr.2d 1] (same). See also *Westhaven Community Development Council v. County of Humboldt* (1998) 61 Cal.App.4th 365, 369, footnote 5 [71 Cal.Rptr.2d 536] (TPA "requires cities and counties to zone described timberlands as 'timberland production zones,' or TPZ's"), 370 (distinguishing *Big Creek v. San Mateo* as not addressing local permit requirements).

[12] The dissent complains that we fail to address former section 4516.5, subdivision (e) (the sunset provision), asking rhetorically, "Why would the Legislature declare *all* county ordinances, rules, or regulations regarding timber operations null and void in former section 4516.5, subdivision (e), if in the preceding subdivision it only sought to limit local authority over *how* timber harvesting could take place?" (Dis. opn., *post,* at pp. 1166–1167.) Assuming only for the sake of argument that the dissent accurately characterizes the sunset provision's impact on the 1982 legal landscape in which it was enacted, we decline to speculate on what policy goals a Legislature besieged by competing economic and other interests might have been seeking to maximize during the period both provisions were the law. The issue before us today is the meaning of *current* section 4516.5(d). As the dissent acknowledges, the sunset provision was repealed by the Legislature in 1984. (See dis. opn., *post,* at p. 1166, fn. 3, citing Stats. 1984, ch. 1446, § 1, pp. 5059–5060.) The ordinances at issue in this case were adopted in 1999, so obviously the sunset provision can have no direct application to them.

For the foregoing reasons, we agree with the Court of Appeal in *Big Creek v. San Mateo* that "the 'conduct' of timber harvesting operations is exclusively governed by state law. 'Conduct' [however] is not given a specialized definition in the FPA. Its ordinary meaning is 'the act, manner, or process of carrying out (as a task) or carrying forward (as a business, government, or war).' " (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 426.) Accordingly, local zoning ordinances, like the County's zone district ordinance, that speak to the location of timber operations but not to the manner in which they are carried out, are not expressly preempted by section 4516.5(d).

### 3. *Implied preemption*

The Legislature's "preemptive action in specific and expressly limited areas weighs against an inference that preemption by implication was intended elsewhere." (*IT Corp. v. Solano County Bd. of Supervisors, supra,* 1 Cal.4th at p. 95; see also *Cippolone v. Liggett Group* (1992) 505 U.S. 504, 517 [120 L.Ed.2d 407, 112 S.Ct. 2608] ["Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted"].) In addition, and specifically pertinent here, "[p]reemption by implication of legislative intent may not be found when the Legislature has expressed its intent to permit local regulations. Similarly, it should not be found when the statutory scheme recognizes local regulations." (*People ex rel. Deukmejian v. County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150].)

Both these bars to implied preemption are present. By expressly preempting local regulations targeting the conduct of timber operations, section 4516.5(d) implicitly permits local regulations addressed to other aspects of timber operations. And, as has been explained, general forestry law—in particular, the TPA—expressly recognizes local zoning authority. Notwithstanding we might, therefore, forgo applying the test for implied preemption applicable when state statutes do not recognize local regulations, applying that test buttresses our conclusion that County's ordinances are not preempted.

"In determining whether the Legislature has preempted by implication to the exclusion of local regulation we must look to the whole purpose and scope of the legislative scheme." (*People ex rel. Deukmejian v. County of Mendocino, supra,* 36 Cal.3d at p. 485.) Implied preemption occurs when: (1) general law so completely covers the subject as to clearly indicate the matter is exclusively one of state concern; (2) general law partially covers the

subject in terms clearly indicating a paramount state concern that will not tolerate further local action; or (3) general law partially covers the subject and the adverse effect of a local ordinance on transient citizens of the state outweighs the possible municipal benefit. (*Ibid.*)

### (a) *Complete coverage*

Plaintiffs contend the Legislature has demonstrated its intent to preempt all local restrictions on timber harvesting by fully occupying the field of timber harvesting regulation. Plaintiffs first note the Legislature's statement of intent, when enacting the FPA, "to create and maintain an effective and comprehensive system of regulation and use of all timberlands." (§ 4513.) Invoking the maxim *expressio unius est exclusio alterius*, they argue that certain provisions of the FPA recognizing limited local authority to regulate timber operations indicate that local authority is otherwise preempted.[13] But as County points out, the Legislature adopted section 4513 at the same time it adopted a provision authorizing counties to adopt timber harvest rules and regulations stricter than the state's rules (Stats. 1973, ch. 880, § 4, pp. 1615–1616 [adding former § 4516]), so the general statement of intent in section 4513 cannot have been intended to preempt local restrictions by occupying the field.

Moreover, plaintiffs' "*expressio unius*" argument implicitly assumes the statutory preemption of local rules that regulate the conduct of timber operations encompasses geographic zoning restrictions on the location of such operations. But because, as demonstrated, section 4516.5(d) does not have that broad meaning, the Legislature had no need to exempt traditional county zoning power from the section's preemptive scope; hence, the presence of statutory exceptions to FPA preemption demonstrates nothing about the Legislature's intent respecting counties' exercise of that power.

▪ To summarize, general forestry law preempts local regulation of the conduct of timber operations but otherwise expressly contemplates retention of local zoning authority. "[L]ocalities must designate certain lands as TPZ's. These zones are dedicated to timber growing and harvesting, and localities may not prohibit logging on them. As to other lands that may contain timber, the TPA expressly reaffirms local authority to choose appropriate zoning. Local legislative bodies retain authority to exclude from the TPZ's certain

---

[13] See, e.g., sections 4516.5, subdivision (f) (counties may regulate conduct of timber operations on "any land area of less than three acres and which is not zoned timberland production"), 4516.5, subdivision (e) (counties may "require performance bonds or other surety for the protection of roads"), and 4584, subdivision (j)(4) (timber operations exempted by Board from FPA for fuelbreak maintenance "shall conform" inter alia to "implementing ordinances, and . . . zoning ordinances").

parcels when they believe exclusion is in the public interest. [Citation.] Localities also retain the authority to choose the non-TPZ zones into which excluded or removed parcels are placed." (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 428.)

We observe, further, that California's Planning and Zoning Law (Gov. Code, § 65000 et seq.) contemplates the continuation of local government's traditional zoning authority in connection with timber resources. In adopting that law, the Legislature specified that localities should "exercise the maximum degree of control over local zoning matters" (*id.,* § 65800), inter alia by designating the "location and extent of the uses of the land" (*id.,* § 65302, subd. (a)) and including the "conservation, development, and utilization of . . . forests" in their general plans (*id.,* subd. (d)). The Planning and Zoning Law also requires counties to adopt in their general plans land use elements that "[d]esignate, *in a land use category that provides for timber production* those parcels of real property zoned for timberland production pursuant to the [TPA]" (§ 65302, subd. (a)(1), italics added), thus implicitly acknowledging the potential for locally designated land use categories that do *not* provide for timber production.

In sum, this is not a case in which "the subject matter [of where logging can occur] has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern." (*People ex rel. Deukmejian v. County of Mendocino, supra,* 36 Cal.3d at p. 485.)

(b) *Partial coverage/paramount state concern*

Plaintiffs argue that even if the state has not fully occupied the field of timber operations regulation, it has a paramount interest in determining the location of such operations. They point to the FPA's requirements that the Board adopt rules and regulations governing the conduct of timber operations (§ 4551.5), that any person seeking to conduct timber operations submit and have approved a timber harvesting plan (§ 4581), and that such plans contain a "description of the land on which the work is proposed to be done" (§ 4582, subd. (c)). They point also to the Board's enactment of several rules that restrict the harvesting activities that may be conducted in particular types of terrain.

We disagree with plaintiffs that either the Legislature's having directed the Board to adopt rules governing the conduct of timber operations or the Board's having adopted such rules, impliedly displaces (any more than it expressly does so) traditional local authority to zone permissible (non-TPZ) locations for timber operations. Surely, "[l]ogging, even when conducted

according to state regulations, may have *some* impacts properly addressed by the [local] zoning authority. That the state has sought to reduce and control these same occurrences through general regulation does not preempt local zoning control, any more than the state and federal regulation of industrial air pollution would preclude a local zoning authority from relying on air pollution as a reason for excluding industrial plants from residential districts." (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 427.)

The Attorney General reached a similar conclusion over 30 years ago, when addressing analogous circumstances. (See *County Zoning Ordinances,* 52 Ops.Cal.Atty.Gen. 138 (1969).) Asked whether a Marin County zoning ordinance purporting to bar "commercial logging, mining, quarrying, and drilling, together with all associated uses, activities and structures, in certain areas of the county" (*id.* at p. 139) was preempted by general state laws (including forestry laws) governing the zoned activities, the Attorney General concluded it was not. "It is true," the Attorney General reasoned, "that California has numerous laws regulating each of the activities prohibited by the proposed ordinance. However, these laws do nothing to preclude an otherwise valid zoning ordinance which prohibits extraction of the resource in question." (*Id.* at pp. 139–140.)

Specifically with respect to "the field of commercial logging" (*County Zoning Ordinances, supra,* 52 Ops.Cal.Atty.Gen. at p. 140), the Attorney General in evaluating Marin County's ordinance stated: "The Forest Practice Act [then §§ 4521–4618], together with the forest practice rules . . . comprehensively regulate forest practices [so as to] occupy the entire field [of forest practices] and local ordinances with respect to such general practices, are invalid due to such preemption. . . . In our opinion, however, this pre-empted area is not so broad as to invalidate a zoning ordinance which *prohibits* logging where such prohibition is otherwise reasonable." (*Ibid.*)

■ For similar reasons we conclude that today's general forestry statutes and regulations fall short of "indicat[ing] clearly that a paramount state concern will not tolerate further or additional local action" (*People ex rel. Deukmejian v. County of Mendocino, supra,* 36 Cal.3d at p. 485), respecting the location of timber operations.

(c) *Partial coverage/adverse effect on transient citizens*

Plaintiffs' overriding concern appears to be that localities may by locational zoning prohibit timber harvesting altogether. The ordinance before us does not have that effect, nor does it appear that any county has attempted

such a result.[14] The zone district ordinance permits timber harvesting on parcels zoned timberland production, mineral extraction industrial, and parks, recreation and open space. To require that commercial timber harvesting occur on land in a "timberland production" or other specified zone is no more a ban on timber harvesting than a regulation requiring that industrial land uses occur on land zoned "industrial" is a ban on factories. County concedes that landowners wishing to harvest timber may apply to County for approval to rezone parcels to TPZ and that County may not deny TPZ rezoning to any qualifying parcel (Gov. Code, § 51113, subd. (a)(1)), nor may County prohibit timber harvesting in TPZ's.[15]

■ We previously have explained that a local ordinance is not impliedly preempted by conflict with state law unless it "mandate[s] what state law expressly forbids, [or] forbid[s] what state law expressly mandates." (*Great Western Shows, Inc. v. County of Los Angeles, supra,* 27 Cal.4th at p. 866.) That is because, when a local ordinance "does not prohibit what the statute commands or command what it prohibits," the ordinance is not "inimical to" the statute. (*Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 902 [16 Cal.Rptr.2d 215, 844 P.2d 534].) Here, County's ordinances are not impliedly preempted by conflict with state forestry law because it is reasonably possible for a timber operator to comply with both.

The zone district ordinance does not mandate what general forestry law forbids or forbids what general forestry law mandates. While the forestry laws generally encourage "maximum sustained production of high-quality timber products . . . while giving consideration to" competing values (§ 4513), they do not require that every harvestable tree be cut. Accordingly, County's zoning ordinance does not conflict with state law simply because it may have the effect of placing some trees, at least temporarily, off limits to logging.[16] Nor does it appear the Board has adopted for Santa Cruz, or any other county, rules that comprehensively address appropriate geographical locations within the county for timber harvesting.

■ In sum, plaintiffs have not identified a clear statement by the Legislature of an intent, when enacting the FPA, to preempt traditional local zoning authority over the location of timber operations. Accordingly, and for all the foregoing reasons, we conclude, as did the Court of Appeal in *Big*

---

[14] Amicus curiae County of San Mateo notes that, in the 10 years since *Big Creek v. San Mateo* upheld San Mateo's timber operation locational zoning ordinance, no county, including Santa Cruz, has attempted to altogether prohibit timber harvesting.

[15] In fact, the record reveals that County has rezoned more than 800 acres of land to the TPZ designation since the challenged ordinances were enacted.

[16] When interpreting statutory provisions "intended to further two separate objectives," we have "stressed the importance of attempting to harmonize these goals" (*Far West Financial Corp. v. D & S Co.* (1988) 46 Cal.3d 796, 810 [251 Cal.Rptr. 202, 760 P.2d 399]).

*Creek v. San Mateo,* that "the Legislature did not intend to preclude counties from using their zoning authority to prohibit timber cutting on lands outside the TPZ's" (*Big Creek v. San Mateo, supra,* 31 Cal.App.4th at p. 426).

### D. *The Helicopter Ordinance*

Like the zone district ordinance's specification of permissible zone districts for timber harvesting, County's helicopter ordinance is a locational zoning provision that regulates not how timber operations may be conducted, but rather where they may take place. (See *Big Creek v. San Mateo, supra,* 31 Cal.App.4th at pp. 424–425.) The helicopter ordinance does not attempt to locally regulate the removal of timber, as it speaks neither to whether nor how helicopters may be used to remove timber. County concedes it lacks authority to prohibit timber removal by helicopters or to regulate the manner in which any such removal is conducted. The helicopter ordinance requires simply that any helicopter staging, loading, and servicing facilities associated with timber operations be *located* either on a parcel of land zoned for timber harvesting or on a parcel adjacent to such, and within the borders of an approved timber harvesting plan.

Accordingly—and for the reasons reviewed in detail above—the helicopter ordinance is preempted neither expressly by section 4516.5(d) nor impliedly by general state forestry law. In the case of the helicopter ordinance, which County apparently enacted to address citizens' fears created by helicopters transporting multi-ton logs by air over or near their neighborhoods, and citizen concerns with throbbing and unbearable noise, the conclusion is buttressed by the fact that both the FPA and the TPA expressly contemplate the survival of localities' power to abate nuisances endangering public health or safety. (See especially Pub. Resources Code, § 4514; Gov. Code, § 51115.5, subds. (a), (b).)

 Specifically, the FPA provides that "[n]o provision of [the FPA] or any ruling, requirement, or policy of the [B]oard is a limitation on . . . the power of any city or county or city and county to declare, prohibit, and abate nuisances." (Pub. Resources Code, § 4514, subd. (a).) And the TPA provides that, while timber operations conducted within a TPZ pursuant to the FPA "shall not constitute a nuisance" (Gov. Code, § 51115.5, subd. (a)), that limitation is inapplicable to any timber operation that "endangers public health or public safety or . . . prohibits the free passage or use of any navigable lake, river, bay, stream, canal, or basin, or any public park, street, or highway" (*id.,* subd. (b)). (See also Civ. Code, § 3479 [definition of nuisance closely mirrors language preserving nuisance-abatement power in Gov. Code, § 51115.5, subd. (b)].)

## Disposition

For the foregoing reasons, we reverse the judgment of the Court of Appeal and remand the cause for further proceedings consistent with our opinion.

George, C. J., Chin, J., and Corrigan, J., concurred.

**MORENO, J.,** Dissenting.—I respectfully dissent. The majority pulls an interpretive rabbit out of a statutory hat by construing Public Resources Code section 4516.5, subdivision (d),[1] part of the Z'berg-Nejedly Forest Practice Act of 1973 (§ 4511 et seq.) (FPA), as preempting only county-imposed limitations on *how* timber operations occur, and not local restrictions on *where* these activities take place. This interpretation cannot be reconciled with the language and purpose of section 4516.5, subdivision (d); with the FPA generally; or with common sense. The distinction that the majority draws between county resolutions, rules, and ordinances regulating how logging transpires, and measures controlling where it takes place, breaks down upon passing scrutiny and provides a roadmap for those who would use technical artifices to evade the letter and spirit of the FPA. The Court of Appeal below properly rejected this delusive distinction and concluded that state law preempts the resolutions and ordinances that are at issue here. I agree with the Court of Appeal, and would affirm.

The disputed resolutions and ordinances were adopted by Santa Cruz County (County) in 1999. Of the measures presently before us, two combine to limit timber harvesting to particular zone districts (Santa Cruz County Res. No. 493-99; Santa Cruz County Ord. No. 4577) and the other forbids helicopter staging, service, and loading areas except within certain areas (Santa Cruz County Ord. No. 4572). The question presented here concerns whether these enactments are preempted by the FPA and, in particular, by section 4516.5, subdivision (d). This subdivision states that, except for exercising authority delegated to them by the State Board of Forestry and Fire Protection (Board of Forestry) to require bonds or other surety for the protection of roads, "individual counties shall not otherwise regulate the conduct of timber operations, as defined by this chapter, or require the issuance of any permit or license for those operations." (*Ibid.*)

To ascertain the meaning of this language, "we look to the intent of the Legislature in enacting the law, 'being careful to give the statute's words their plain, commonsense meaning. [Citation.] If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to

---

[1] All subsequent statutory references are to the Public Resources Code except as otherwise noted.

determine the Legislature's intent is unnecessary.' [Citation.] Additionally, we must interpret [section 4516.5, subdivision (d)] in context with the entire statute and the statutory scheme. [Citation.]" (*In re Jennings* (2004) 34 Cal.4th 254, 263 [17 Cal.Rptr.3d 645, 95 P.3d 906].)

Following these principles, it is important to note at the outset that the preemption provision replaced a statutory scheme that allowed for county regulation of timber operations above and beyond that undertaken by the state. The FPA is designed to "create and maintain an effective and comprehensive system of regulation and use of all timberlands." (§ 4513.) Toward this purpose, the FPA creates an architecture for state control over timber operations. As originally enacted, the FPA also allowed counties to, "within the reasonable exercise of their police power . . . adopt rules and regulations by ordinance or resolution which are stricter than those provided under this chapter and its regulations." (Former § 4516, added by Stats. 1973, ch. 880, § 4, pp. 1614, 1615.)

By the early 1980's, however, some observers regarded county ordinances as having "essentially prevented the harvest of timber, contrary to the intent of the FPA." (Dept. of Forestry, Enrolled Bill Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) Sept. 15, 1982, p. 2.) This concern prompted a revision of the FPA in 1982 that replaced county regulation of timber operations with a system in which counties could recommend rules and regulations to the Board of Forestry. As signed into law, the amendments deleted the provisions of the FPA that had allowed for stricter local control over timber operations. (Stats. 1982, ch. 1561, § 2, p. 6164.) At the same time, the measure added section 4516.5 to the law. (Stats. 1982, ch. 1561, § 3, pp. 6164–6165.) Whereas the deleted provisions had endorsed direct local regulation of timber harvesting, section 4516.5 instead allows counties to recommend proposed forestry rules to the Board of Forestry, thereby channeling local concerns through the state agency with principal responsibility for interpreting the FPA. (§ 4516.5, subd. (a).) The Board of Forestry must adopt these proposed rules as regulations if they comport with state law and are necessary to protect the "needs and conditions" of the proposing county. (*Id.*, subd. (b).) Except for this procedure for proposing regulations to the Board of Forestry, and limited, delegated authority to require surety for the protection of roads (*id.*, subd. (e)), the FPA prohibits counties from regulating timber operations. As stated above, "individual counties shall not otherwise regulate the conduct of timber operations, as defined by this chapter, or require the issuance of any permit or license for those operations." (§ 4516.5, subd. (d).)[2]

---

[2] The FPA also includes a savings clause, which clarifies that the law does not affect the authority of local governments to declare, prohibit, and abate nuisances. (§ 4514, subd. (a).)

The plain language of this preemption provision offers no support for the interpretation advanced by *Big Creek Lumber Co. v. County of San Mateo* (1995) 31 Cal.App.4th 418, 424–426 [37 Cal.Rptr.2d 159] (*Big Creek I*) and adopted by the majority (maj. opn., *ante,* at p. 1157), to the effect that the statute preempts only county rules, regulations, and ordinances affecting how timber operations occur, while leaving untouched measures addressing where these operations take place. Instead, the preemption provision speaks in terms that are expansive enough to leave no doubt that the Legislature intended to displace all local rules, ordinances, and resolutions specifically regulating timber operations. Section 4516.5, subdivision (d) prohibits county regulation of "the conduct of timber operations." As *Big Creek I* and the decision by the Court of Appeal below recognized, "conduct" means " 'the act, manner, or process of carrying out (as a task) or carrying forward (as a business, government, or war).' (Webster's Third New Internat. Dict. (1970) p. 473.)" (*Big Creek I, supra,* 31 Cal.App.4th at p. 426; see also Black's Law Dict. (6th ed. 1991) p. 295 [defining "conduct" as "[p]ersonal behavior; deportment; mode of action; any positive or negative act"].) If we substitute this definition of "conduct" into the statute, section 4516.5, subdivision (d) would provide in relevant part: "Individual counties shall not otherwise regulate the [act, manner, or process] of timber operations, as defined by this chapter, or require the issuance of any permit or license for those operations." The Court of Appeal below, therefore, accurately discerned that "conduct," as used in the statute, "necessarily includes the 'act' of doing the task at all. Local measures that forbid logging in certain locations 'regulate the conduct of timber operations' in those places in the most fundamental way imaginable—by prohibiting it outright."

The Legislature did not draw a line between permissible "where" and impermissible "how" ordinances both because such a distinction would have no relationship to the impetus for the amendments and because, in practical fact, no such line can ever be drawn. Does an ordinance precluding the clear-cutting method of logging within riparian corridors concern *where* clear-cutting may take place, or *how* logging occurs within specified areas? Clearly it does both. What about an ordinance that precludes the use of heavy machinery within county limits? Does that ordinance limit *how* a business may conduct its affairs (i.e., by using heavy machinery, or not), or *where* it may operate (i.e., in the county, or not), if it chooses to use that machinery? And does an ordinance barring the yarding of felled trees by helicopter become any more permissible if the county achieves the same goal by drafting the measure so that it forbids the placement of helicopter landing pads anywhere in the county?

---

Local regulations concerning certain timber operations covering less than three acres are also exempted from the preemption provision. (§ 4516.5, subd. (f).)

True, a regulation may superficially purport to address only how or where timber operations take place. But given the aims of the Legislature in adding section 4516.5 to the FPA, I find it difficult to believe that section 4516.5, subdivision (d) concerns only the form, and not the substance, of county ordinances. To paraphrase the point made by the Court of Appeal below, the Legislature could not have intended to allow counties a continued ability to "essentially prohibit[] the harvest of timber" (Dept. of Forestry, Enrolled Bill Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) p. 2), through the simple expedient of disallowing said harvesting virtually anywhere in the county. And whatever the Legislature had in mind in enacting section 4516.5, subdivision (d), I doubt that it intended to create a cottage industry in the drafting of local ordinances that appear to regulate only where timber operations may occur, while in actual practice directing how these operations may take place.

From the above, I conclude that section 4516.5, subdivision (d), on its own, directs affirmance of the Court of Appeal, for both the zoning ordinance and the helicopter ordinance regulate the "conduct of timber operations" by directly constraining the "act, manner, or process" of these operations. Yet while the plain language of section 4516.5, subdivision (d) suffices to resolve this case, other provisions of the FPA further establish that the how/where distinction espied by the majority was never contemplated by the Legislature, and that lawmakers sought to abrogate ordinances similar to those involved here.

As enacted, section 4516.5 included a sunset provision that nullified existing county regulations and ordinances regulating timber operations. The sunset provision provided as follows: "Notwithstanding this section or any other provision of state law, any county which regulated the growing or harvesting of timber or the conduct of timber harvesting operations pursuant to an ordinance, rule, or regulation in effect on January 1, 1982, may continue fully to enforce the ordinance, rule or regulation until July 1, 1983. On and after that date, all such local ordinances, rules and regulations, unless adopted pursuant to this section, shall be null, void, and have no force or effect." (Former § 4516.5, subd. (e), added by Stats. 1982, ch. 1561, § 3, pp. 6164, 6165.)[3] This provision on its face renders null and void any and all local ordinances, rules, and regulations "which regulate[] the growing or harvesting of timber or the conduct of timber harvesting operations." The majority regards comparable language as unambiguously manifesting an intent to outlaw all local regulation of timber operations. (See maj. opn., *ante,* at p. 1156.) The reasoning embraced by the majority thus begs the following question: Why would the Legislature declare *all* county ordinances, rules, or

---

[3] The sunset period having expired, the Legislature amended section 4516.5 in 1984 to remove the sunset provision. (Stats. 1984, ch. 1446, § 1, pp. 5059–5060.)

regulations regarding timber operations null and void in former section 4516.5, subdivision (e), if in the preceding subdivision it only sought to limit local authority over *how* timber harvesting could take place?

The FPA's savings clause, meanwhile, reserves to counties their traditional prerogative of declaring nuisances. (See § 4514, subd. (a).) Yet neither the savings clause nor any other provision of the FPA mentions zoning or other locational ordinances, except to provide that in situations where timber harvesting undertaken to minimize fire hazards is *exempt* from the FPA (thus averting any possibility of conflicts between the FPA and local ordinances), said harvesting must comply with generic zoning ordinances. (§ 4584, subd. (j)(4).) That the Legislature has expressly preserved within the FPA one aspect of local police power (nuisance regulation) but not another (zoning) indicates that the omission of the latter was intentional, not accidental, and that zoning designed to limit timber operations does not escape the preemptive scope of section 4516.5, subdivision (d).[4]

The analyses and reports prepared for Senate Bill No. 856—the legislation that abrogated local regulatory authority over timber operations and added section 4516.5 to the FPA—shed additional light on the Legislature's intent in enacting the measure. The Legislature and its staff framed the preemptive effect of the legislation in broad terms. The conference committee report on this measure provided, in pertinent part, "Certain counties (Santa Cruz, Santa Clara, San Mateo, Sonoma, Marin) have adopted forest practice rules and regulations which are stricter than those provided under the Z'berg-Nejedly Forest Practice Act. This bill would take away that power by preempting counties from exercising local control." (Conf. Com., Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) Aug. 24, 1982, p. 2.) Similarly, the Legislative Analyst's analysis of the bill provided, "This bill . . . [r]epeals provisions of existing law which authorize counties to regulate timber harvesting more restrictively than provided under the Z'berg-Nejedly Forest Practice Act," while noting that the legislation "[e]stablishes an alternate process whereby individual counties may recommend to the Board of Forestry for adoption new rules and regulations governing timber operations." (Legis. Analyst, analysis of Sen. Bill No. 856 (1981–1982 Reg. Sess.) May 24, 1982, p. 1.) Likewise, the enrolled bill report prepared by the Department of Forestry and Fire Protection (Department of Forestry) observed that the

---

[4] Moreover, the Legislature has shown in other contexts that it knows how to expressly preserve local zoning when it wants to do so. Some other laws that might otherwise have had an effect on local zoning prerogatives expressly save the authority of local entities to regulate zoning. (See, e.g., Bus. & Prof. Code, § 23791 [Alcoholic Beverage Control Act provision disavowing any interference with local zoning authority], Health & Saf. Code, § 18300, subd. (g)(1) [provision in the Mobilehome Parks Act allowing local governments to establish certain zones for mobilehomes].) But the Legislature chose not to add similar language to the FPA.

legislation *"eliminates the authority of individual counties to regulate timber harvesting operations,* and establishes instead a procedure for the Board of Forestry to adopt rules to cover local concerns." (Dept. of Forestry, Enrolled Bill Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) p. 1, italics added.) Noticeably absent from these and other expressions of intent is any indication that the Legislature intended to allow counties continued control over *where* timber harvesting could occur, and eliminate only local authority over *how* logging operations are performed.

In sum, the Legislature enacted section 4516.5 in response to local ordinances that had "essentially prevented the harvest of timber, contrary to the intent of the FPA." (Dept. of Forestry, Enrolled Bill Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) p. 2.) Consistent with the Legislature's objective, section 4516.5, subdivision (d) prohibits local regulation of "the conduct of timber operations." The word "conduct," as used in section 4516.5, subdivision (d), includes *both* the act of doing something *and* how it is done. And at the same time that the Legislature enacted section 4516.5, it "sunsetted" all local rules, regulations and ordinances relating to "the growing or harvesting of timber or the conduct of timber harvesting operations" (former § 4516.5, subd. (e)), using language so sweeping that the majority does not even attempt to address it.[5] In my view, these facts establish that section 4516.5, subdivision (d) constrains counties' ability to directly regulate timber harvesting, regardless of whether said regulations are better described as affecting how logging operations occur or where they take place.

Nonetheless, the majority regards the Legislature as having limited only counties' authority to regulate how logging transpires. In other words, the majority considers it perfectly acceptable for a county to "essentially prevent[] the harvest of timber" (Dept. of Forestry, Enrolled Bill Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) p. 2), provided a county does so by regulating *where* timber harvesting occurs, not *how* it happens. The majority advances several arguments in support of this interpretation of section 4516.5, subdivision (d). None of these contentions withstand scrutiny.

---

[5] The majority's sole response to the sunset provision consists of a footnote (maj. opn., *ante,* at p. 1156, fn. 12) that asserts that we need not consider the clause at all because it is no longer part of the FPA. But "[i]t is axiomatic that in assessing the import of a statute, we must concern ourselves with the Legislature's purpose at the time of the enactment." (*In re Pedro T.* (1994) 8 Cal.4th 1041, 1048 [36 Cal.Rptr.2d 74, 884 P.2d 1022], italics added.) The sunset provision, which was enacted as part of section 4516.5, affords substantial insight into the Legislature's intent in amending the FPA to limit local authority over timber operations. That the Legislature later removed the sunset provision from the FPA once the sunset period came to an end does not somehow strip the clause of its usefulness for purposes of discerning the intent of the enacting Legislature. "[L]egislative activity *after* the passage of the sunset provision casts no light on the Legislature's intent *when it enacted the statute.*" (*In re Pedro T., supra,* 8 Cal.4th at p. 1048.)

The majority begins by invoking a presumption against state preemption of "a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another." (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 707 [209 Cal.Rptr. 682, 693 P.2d 261].)[6] The majority restyles this presumption into a "clear indication" rule, announcing that "when local government regulates in an area over which it traditionally has exercised control, such as the location of particular land uses, California courts will presume, absent a clear indication of preemptive intent from the Legislature, that such regulation is *not* preempted by state statute." (Maj. opn., *ante,* at p. 1149.) Neither *IT Corp. v. Solano County Bd. of Supervisors* (1991) 1 Cal.4th 81, 93 [2 Cal.Rptr.2d 513, 820 P.2d 1023], which the majority cites for this principle, nor any other decision by this court has ever so augmented the *Fisher* presumption against state abrogation of local regulations. Instead, the approach adopted by the majority appears to draw from the rule applied in cases involving federal preemption of state law. (See *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 956–958 [17 Cal.Rptr.3d 180, 95 P.3d 422].) The majority transplants this clear indication rule into the context of state preemption of local regulations, but without considering whether the factors that have led courts to recognize the precept in federal preemption cases apply with equal force here. Nor does the majority attempt to devise a coherent approach toward distinguishing those areas in which localities have "traditionally" exercised control from those in which they have not, except to say that "the location of particular land uses" generally qualifies as a traditional subject of local regulation.

Putting these deficits aside, and leaving for another day the question of whether it is appropriate to employ a clear indication rule in disputes involving state preemption of local regulations, there are several' problems with the majority's application of this approach here. The majority concludes that the Legislature did not clearly indicate its preemptive intent with regard to zoning because section 4516.5, subdivision (d) does not refer to zoning or other locational restrictions expressly or "in terms." (Maj. opn., *ante,* at p. 1152.) But the majority cites no authority that has endorsed or even intimated this "magic words" approach to statutory interpretation. Up until now, it has sufficed for the Legislature to make its intentions known in the manner it sees fit, without being required to employ particular terms. The Legislature that enacted section 4516.5, subdivision (d) could not have

---

[6] In a recent case decided by this court also involving a claim of express state preemption of local land use regulations, *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725 [29 Cal.Rptr.2d 804, 872 P.2d 143], we stated that "[t]he general principles governing state statutory preemption of local land use regulation are well settled." (*Id.* at p. 747.) Yet our ensuing discussion of these "well settled" principles made no mention of any presumption against preemption. (*Id.* at pp. 747–748.)

foreseen that it had to refer to county zoning or other locational ordinances "in terms" for a court to later determine that lawmakers meant to preclude these measures.

Perhaps more important, the "terms" approach subtly invades the province and prerogatives of the Legislature by requiring lawmakers to embrace particular verbal formulations as a prerequisite to judicial recognition of their avowed intent. Our job as jurists is not to make the Legislature jump through linguistic hoops of our own capricious design. "[T]he [majority] does not explain by what authority courts can dictate to legislative drafters the forms in which laws must be written to express the legislative intent. Rather, what *is* required is that the Legislature demonstrate its intention with sufficient clarity that a reviewing court can discern and effectuate it." (*In re Pedro T., supra,* 8 Cal.4th at pp. 1048–1049, fn. omitted.)

This latter criticism has particular force here, given how the majority has rather arbitrarily chosen the "terms" it requires. Section 4516.5, subdivision (d) expressly discusses the *substantive* terms of the preempted local regulations— i.e., they must concern "the conduct of timber operations." But the majority rejects this wording as insufficient and unclear. Instead, the majority concludes that the Legislature should have known that it had to expressly address zoning and locational ordinances "in terms" for us to discern a preemptive intent. In other words, the required "terms" involve the manner of regulation, not the substance of these rules. Again, how the Legislature should have foreseen this nuance is anyone's guess. Undoubtedly, the Legislature will respond to this approach with more detailed and complex statutes that try to anticipate the particular "terms" courts will require in the future. I do not grasp how this will clarify or otherwise improve the law.

Next, the majority claims that the Legislature must have intended that the words "the conduct of," as used within section 4516.5, subdivision (d), would limit the scope of the preemption provision to *how* logging occurs; otherwise, the majority asserts, this phrasing would constitute mere surplusage. (Maj. opn., *ante,* at p. 1155.) The majority reads too much into these three words. This error leads it to adopt a construction of section 4516.5, subdivision (d) so susceptible to abuse and evasion through clever drafting that it violates another principle of statutory interpretation, "[s]uperfluity does not vitiate" (Civ. Code, § 3537), a maxim that directs that the presence of arguably unnecessary terms in a statute should not, by itself, produce an interpretation that will defeat the Legislature's central aims in enacting the law.

In prohibiting local regulation of "the conduct of timber operations," the Legislature simply echoed phrasing used elsewhere in the FPA. Specifically, section 4551.5 states, in pertinent part, that rules and regulations adopted by

the Board of Forestry "shall apply to the conduct of timber operations." Pursuant to its authority to regulate "the conduct of timber operations," the Board of Forestry controls both *how* timber harvesting occurs and *where* it takes place. To take two examples of regulations that affect where logging may occur, the Board of Forestry has limited timber harvesting in "channel zones" (Cal. Code Regs., tit. 14, § 916.9, subd. (e)), and near bird nesting sites (*id.,* §§ 919.2–919.3). The use of the phrase "the conduct of" in section 4551.5, therefore, does not cabin the Board of Forestry's regulatory authority only to *how* timber harvesting occurs. And when the Legislature uses the same phrasing in different parts of a statute, all else being equal, we assume that it intends to imbue the terms with the same meaning in each context. (*People v. Wells* (1996) 12 Cal.4th 979, 986 [50 Cal.Rptr.2d 699, 911 P.2d 1374].) This principle means that the identical "the conduct of" phrasing in section 4516.5, subdivision (d) does not limit the preemption provision only to county regulations concerning *how* logging takes place.

The majority also purports to find support for its interpretation in the California Timberland Productivity Act of 1982 (TPA), another statute relating to timber harvesting. (Stats. 1982, ch. 1489, §§ 1–39, pp. 5748–5766.) The TPA seeks to, inter alia, "[d]iscourage premature or unnecessary conversion of timberland to urban and other uses" (Gov. Code, § 51102, subd. (a)(2)) and "[e]ncourage investment in timberlands based on reasonable expectation of harvest" (*id.,* subd. (a)(4)). Because conventional taxation methods were regarded as deterring efficient timber operations, the TPA amends but essentially reaffirms a system adopted by a predecessor statute through which timberlands may be placed in "Timberland Preserve Zones" (now referred to as "Timberland Production Zones" or TPZ's). (See Gov. Code, § 51112, subd. (c); Unkel & Cromwell, *California's Timber Yield Tax* (1978) 6 Ecology L.Q. 831, 845.)[7] Parcels designated TPZ are assessed for tax purposes based on their value for timber production and compatible uses. (See Rev. & Tax. Code, §§ 431, 434.5, 435.) This scheme thus affords a measure of tax relief to those who grow and harvest timber.

The majority stresses that various provisions of the TPA that relate to TPZ designations mention and rely upon local zoning authority. (Maj. opn, *ante,* at p. 1154.) While this is an accurate observation, it does little to prove that the Legislature countenanced the use of this authority to directly regulate timber operations. Neither TPZ designations themselves, nor any other reference to zoning within the TPA, suggests that the lawmakers who enacted that

---

[7] The predecessor statute, the Z'berg-Warren-Keene-Collier Forest Taxation Reform Act, also substituted a yield tax on the value of harvested timber for the preexisting ad valorem tax on standing timber, thereby providing a tax incentive that discourages premature harvesting and the conversion of timberland to other uses. (Stats. 1976, ch. 176, § 2, pp. 293–294; see Rev. & Tax. Code, § 38101 et seq.)

statute and the pertinent amendments to the FPA considered it acceptable for counties to use their zoning powers in this specific manner. Only section 4516.5, subdivision (d) speaks to this subject, and its plain language establishes that the Legislature has taken this authority away from counties.

Another part of the TPA relied upon by the majority, Government Code section 51115, provides that "[p]arcels zoned as timberland production shall be zoned so as to restrict their use to growing and harvesting timber and to compatible uses. The growing and harvesting of timber on those parcels shall be regulated solely pursuant to state statutes and regulations." This language, the majority states, expresses an unambiguous legislative intent to preclude local regulation of timber operations. (Maj. opn., *ante,* at p. 1155.) I agree, and observe that the sunset provision enacted in 1982 as Public Resources Code section 4516.5, subdivision (e), contained similar language, suggesting that the Legislature intended with section 4516.5 as well to prevent counties from regulating how or where timber operations may occur.

According to the majority, "[o]ne implication of [the language within section 51115], of course, is that the growing and harvesting of timber on non-TPZ parcels need not be regulated solely pursuant to state statutes and regulations." (Maj. opn., *ante,* at p. 1155.) This carefully couched phrasing implies, correctly, that alternative implications also exist. The Legislature added the second sentence to Government Code section 51115 in the same stroke as it enacted section 4516.5. (See Stats. 1982, ch. 1561, §§ 1, 3, pp. 6164–6165.) In so doing, the Legislature may have intended to reaffirm, within the TPA, the principles endorsed by section 4516.5, subdivision (d). While this may have been unnecessary, the majority's reading of section 4516.5 creates surplusage of its own. If, as the majority concludes, section 4516.5 does not disturb local zoning authority, there would have been no need for the Legislature to specify, as it has, that timber harvesting conducted for fire-prevention purposes still must comply with local zoning ordinances. (§ 4584, subd. (j)(4).)[8]

---

[8] Also contrary to the majority's assertions, the interpretation of section 4516.5, subdivision (d) advanced by plaintiffs and accepted by the Court of Appeal does not render the statutory definition of "timberland" partly surplusage. Under the FPA, " 'timberland' " means "land . . . which is available for, and capable of, growing a crop of trees of any commercial species used to produce lumber and other forest products." (§ 4526.) Considering this language, the majority states, "The phrase 'available for' would be superfluous if the definition were read to include *any* land that is capable of growing qualified trees, but that is what plaintiffs implicitly urge . . . ." (Maj. opn., *ante,* at p. 1155.) Plaintiffs urge no such thing. All parties recognize that, section 4516.5 or no, the state retains its authority to regulate timber operations. By operation of state regulations, land may be "capable" of timber harvesting but not "available" for these operations. This being the case, nothing within the interpretation of section 4516.5, subdivision (d) commended by plaintiffs renders the definition of "timberland" within section 4526 surplusage, in whole or in part.

The majority also claims that it would be "absurd" to allow timber harvesting near residential areas, and that the Court of Appeal's analysis would compel such a result. (Maj. opn., *ante,* at p. 1156.) This invocation of the absurdity doctrine is ill considered. Regardless of whether section 4516.5, subdivision (d) prohibits other forms of local control over timber operations, counties still may declare certain timber operations to be nuisances (§ 4514, subd. (a)); propose to the Board of Forestry regulations concerning timber operations, with the Board of Forestry being required to adopt these proposals if they comport with the FPA (§ 4516.5, subds. (a), (b));[9] and regulate harvesting on plots of less than three acres that are not given a TPZ zoning designation (§ 4516.5, subd. (f)). Also, the Department of Forestry regulates timber harvesting through its review and approval of the timber harvesting plans required for virtually all commercial logging. (See §§ 4581–4583.) The FPA allows Santa Cruz County to recommend that the Board of Forestry adopt additional rules and regulations regarding the content of these plans. (§ 4516.8.) So the real question is much more narrow than the majority suggests: whether it would be "absurd" to deny localities the right to forbid or limit timber operations, other than those constituting a nuisance, on parcels of more than three acres that are located near residential areas, where the Board of Forestry has declined to enact sufficient prophylactic rules and the pertinent timber harvesting plan has not addressed residents' concerns. The Legislature already has answered this question in the negative, for as all parties agree, it already has precluded local regulation of timber harvesting on all parcels zoned TPZ, regardless of their location. (Gov. Code, § 51115.) Apparently the Legislature is of the view that the Board of Forestry and the approval process for timber harvesting plans will provide sufficient safeguards in such cases.[10]

Finally, the majority claims to find support for its interpretation of section 4516.5, subdivision (d) in the Legislature's perceived acquiescence in the holding in *Big Creek I, supra,* 31 Cal.App.4th 418. (Maj. opn., *ante,* at pp. 1156–1157.) Some perspective is in order here. We granted review to settle a dispute between two—and only two—published decisions by the Courts of Appeal. *Big Creek I* was the earlier decided case, but under the circumstances I am aware of no authority—and the majority cites to none— holding that we must defer to the initial panel's conclusions simply because

---

[9] The procedure for submitting proposed rules to the Board of Forestry is no empty vessel; the Board of Forestry has in fact enacted more than 20 regulations proposed by Santa Cruz County, including rules relating to helicopter yarding. (Cal. Code Regs., tit. 14, §§ 926–926.25 [Santa Cruz County-specific logging rules].)

[10] Furthermore, by preempting only local regulations pertaining to "timber operations," a defined term under the FPA (see § 4527), the Legislature assumed that counties could "continue to regulate timber operations for aesthetic purposes (e.g., tree trimming ordinances) to require restocking of harvested timber, use of county roads, etc." (Conf. Com., Rep. on Sen. Bill No. 856 (1981–1982 Reg. Sess.) p. 1.)

they were the first to publish their views. Were legislative acquiescence so easily discerned and so potent a consideration, we would never disapprove of the earlier of two conflicting decisions. Such a rule would make our jobs inestimably easier but, easily, less estimable. Yet we do uphold the more recent decision in such situations, time and again. (See, e.g., *People v. Leal* (2004) 33 Cal.4th 999, 1003, 1010 [16 Cal.Rptr.3d 869, 94 P.3d 1071]; *Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715, 724, fn. 4 [3 Cal.Rptr.3d 623, 74 P.3d 726]; *People v. Adair* (2003) 29 Cal.4th 895, 902, 908, fn. 6 [129 Cal.Rptr.2d 799, 62 P.3d 45].) Whatever the merits of legislative acquiescence as an interpretive tool, it has virtually no bearing on the issue before us.

The majority also adopts a mistaken understanding of the doctrine of legislative acquiescence. The majority surmises legislative acquiescence in *Big Creek I, supra,* 31 Cal.App.4th 418, because the Legislature has amended the FPA numerous times since that decision, without revisiting section 4516.5. (Maj. opn., *ante,* at p. 1156.) But the acquiescence doctrine requires more than merely that the Legislature amended a statute at some point after a particular provision has been judicially construed. For the doctrine to apply in full measure, the general subject that had been interpreted by the courts must come before the Legislature in connection with a subsequent amendment. (*Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483, 506 [66 Cal.Rptr.2d 304, 940 P.2d 891] (*Ventura County*).) Here, the parties have not brought to our attention any indication that the subject of state preemption of local authority over timber operations has come before the Legislature in connection with any amendment to the FPA over the past decade. Section 4516.5 itself was last amended in 1984, more than 10 years before *Big Creek I* was decided. (Stats. 1984, ch. 1446, § 1, pp. 5059–5060.) The amendments to various *other* sections of the FPA that the majority relies upon fail to establish that the Legislature acquiesced in the interpretation of section 4516.5, subdivision (d) advanced in *Big Creek I.* (See *Ventura County, supra,* 16 Cal.4th at p. 506.)

*Ventura County, supra,* 16 Cal.4th 483, squarely addresses the acquiescence issue before us. There we were concerned with the proper interpretation of the County Employees Retirement Law of 1937 (Gov. Code., § 31450 et seq.). A Court of Appeal decision more than 10 years before *Ventura County* had interpreted portions of the law pertaining to the computation of pensions. (See *Ventura County, supra,* 16 Cal.4th at pp. 490–492.) In the intervening years, the Legislature amended various provisions of the law numerous times, without disturbing the interpretation advanced by the Court of Appeal. (*Id.* at p. 505.)

The foregoing facts, it was contended, generated an inference of legislative acquiescence in the interpretation advanced by the earlier court. (*Ventura County, supra,* 16 Cal.4th at pp. 505–506.) We disagreed, observing that "[i]t is not clear, however, that the general subject of county employee pensions was before the Legislature when any of the amendments to which the county refers was enacted. Instead the amendments appear to address discrete aspects of the law or to have a general but nonsubstantive effect, such as gender-neutral wording. The county identifies none which suggests that the subject of pension computation generally was before the Legislature when one or more of the amendments was enacted." (*Id.* at p. 506.) Similarly here, while the Legislature has amended distinct provisions of the FPA many times in the decade since *Big Creek I* was decided, no indication appears that the Legislature considered the preemption of local regulation of timber operations in connection with any of these amendments. The majority's reliance on legislative acquiescence under these circumstances is impossible to reconcile with our reasoning in *Ventura County.*

Furthermore, even assuming that the Legislature has accepted the result reached by *Big Creek I, supra,* 31 Cal.App.4th 418, the question remains whether the Legislature has endorsed a broad application of the reasoning in *Big Creek I* similar to that embraced by the majority here. *Big Creek I* dealt with a county ordinance that prohibited logging within 1,000 feet of a legal dwelling. (*Id.,* at p. 422.) The *Big Creek I* court found the ordinance valid because it regulated where logging was conducted rather than how it was performed. (*Id.,* at pp. 424–425.) I am unconvinced that the Legislature's failure to revisit section 4516.5, subdivision (d) in the decade since implies that it would approve of *every* ordinance cast as a "where" rather than a "how" regulation, even if in substance the ordinance seems to control the "where" only as a means of getting to the "how."

Santa Cruz's helicopter ordinance seems a case in point. The County enacted the ordinance only after the Board of Forestry declined to enact a proposed regulation that would have limited the use of helicopters in timber harvesting. The ordinance regulates where timber companies may locate their helicopter staging, loading, and service areas. By controlling where helicopters may be used for timber operations, the ordinance effectively regulates how logging will be performed within county limits. By upholding this helicopter ordinance, in particular, the majority effectively concedes that the purported distinction between ordinances that regulate how timber operations are conducted and those that regulate where they occur is wholly illusory, and that with a drafting sleight-of-hand virtually any local limitation upon timber operations will evade the proscription of county regulation set forth in section 4516.5, subdivision (d).

It might be the case that the County can defend its helicopter ordinance under a nuisance theory. The parties have not briefed this issue, and I would not decide it. But otherwise, I believe that the County's zoning and helicopter resolutions and ordinances violate the letter and spirit of section 4516.5, subdivision (d). Therefore, I respectfully dissent.

Kennard, J. and Baxter, J., concurred.

The petition of plaintiffs and appellants for a rehearing was denied August 30, 2006, and the opinion was modified to read as printed above. Kennard, J., Baxter, J., and Moreno, J., were of the opinion that the petition should be granted.