Filed 4/19/13  JHP LLC v. Japp CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JHP LLC,<br><br>          Plaintiff and Appellant,<br><br>v.<br><br>CARY JAPP et al.,<br><br>          Defendants and Respondents. | A132977<br><br>(Del Norte County<br>Super. Ct. No. CVPT091438) |

Del Norte County approved subdivision developments on two residentially-zoned parcels of land owned by JHP LLC (JHP).  The California Department of Forestry and Fire Protection (Department) identified those parcels as timberland under the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.[1]; hereafter Forest Practice Act) and required JHP to apply for timberland conversion permits (or exemptions from the permit requirement) and for approval of timber harvest plans (THP's) to cut or remove trees from the parcels.  The Department also undertook an environmental review as part of the THP approval process as to one of the parcels, even though the county had already conducted an environmental review of the underlying subdivision project pursuant to the California Environmental Quality Act (CEQA), section 21000 et seq.

---

[1] All undesignated statutory references are to the Public Resources Code.  Rule references cited as the Forest Practice Rules in text and as FP Rules parenthetically are to title 14 of the California Code of Regulations.

1

JHP petitioned for a writ of mandate in the trial court alleging respondents wrongfully classified JHP's parcels as timberland and required duplicative environmental review. JHP first argues the parcels cannot be classified as timberland under the Forest Practice Act, because they have been locally zoned residential (citing *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139 (*Big Creek/Santa Cruz*) [local zoning may render land not available for growing a crop of trees and thus not timberland as defined by the Forest Practice Act]). The trial court granted judgment on the pleadings to the Department on this issue, and we affirm. Assuming that local land use regulation could render land not available for growing a crop of trees, as suggested in *Big Creek/Santa Cruz*, JHP has not pled facts sufficient to show that the Del Norte County land use regulations have done so. Moreover, the county's approval of the specific subdivision development projects on JHP's parcels do *not* render the parcels nontimberland because the Forest Practice Act expressly grants the Department jurisdiction over conversions of timberland to nontimberland use.

JHP also argues the Department's environmental review as part the THP process is duplicative of the county CEQA review of the underlying subdivision project and thus violates section 21166, which restricts subsequent or supplemental environmental reviews. The trial court granted judgment on the pleadings in favor of the Department on this issue as well. We reverse. We find that JHP's claim cannot be resolved without development of a factual record.

## I. STATUTORY FRAMEWORK

Timberland use in California is governed principally by the Forest Practice Act and the California Timberland Productivity Act of 1982 (Gov. Code, § 51100 et seq.; hereafter Timberland Productivity Act). (See generally, *Big Creek/Santa Cruz, supra,* 38 Cal.4th at pp. 1146–1149.) Although this case directly implicates only the Forest Practice Act, it is helpful to briefly review the Timberland Productivity Act in order to understand the overall statutory scheme.

A.    *Timberland Productivity Act*

The Timberland Productivity Act and its predecessor legislation establishes a procedure to designate certain land parcels timberland production zones (TPZ's; formerly known as timberland preserve zones).  (Gov. Code, § 51100 et seq.; Stats. 1976, ch. 176, § 4.5, p. 305.)  The purpose of establishing TPZ's is to ensure an optimal supply of timberland in the state for commercial uses.[2]  (Gov. Code, §§ 51101–51102.)  Consistent with this purpose, timberland is defined in the Timberland Productivity Act as land that is "*devoted to and used for* growing and harvesting timber . . . and which is capable of growing an average annual volume of wood fiber of at least 15 cubic feet per acre."  (*Id.* at § 51104, subd. (f), italics added.)  That is, timberland is defined by the parcel's actual use and commercial capacity.

Soon after the original legislation was enacted in 1976, each county was required to identify parcels within its borders for which, in the county's assessment, "growing and harvesting timber [was] the highest and best use of the land."  (Gov. Code, § 51110, subd. (a).)  Those parcels had to be zoned TPZ unless, following a public hearing process, the county revised its assessment of the parcels' best use or the property owners contested the county's assessment.  (*Id.* at § 51112, subd. (a).)  All remaining timberlands had to be zoned TPZ unless the county found it was in the public interest to exclude them from the zones.  (*Id.* at § 51112, subds. (b), (c).)  Nontimberland parcels could be zoned TPZ if the owners presented a feasible plan to grow and harvest timber on the parcels (i.e., showed they intended to *use* the land for timber harvesting).  (*Id.* at § 51113.)  TPZ-zoned parcels can be rezoned to nontimberland use under certain conditions, either after a 10-year waiting period (*id.* at §§ 51120–51121) or in certain circumstances immediately (*id.* at §§ 51130–51134).  The act provides that the "growing and harvesting of timber on

_____

[2] Parcels zoned TPZ are subject to renewable 10-year restrictions on their nontimberland use, similar to restrictions under the Williamson Act (also known as the California Land Conservation Act of 1965, Gov. Code, § 51200 et seq.; see Gov. Code, § 51200).  In exchange, owners of TPZ parcels receive favorable tax treatment and timber operations on the parcels are afforded special protections.  (Gov. Code, §§ 51110–51111, 51114, 51115, 51115.1, 51115.2, 51115.5, 51118, 51119.5; Cal. Const., art. XIII, § 3.)

[TPZ] parcels shall be regulated solely pursuant to state statutes and regulations." (*Id.* at § 51115.) Nothing in the record before us shows, and the parties do not contend, that the parcels at issue here have ever been zoned TPZ.

B.     *Forest Practice Act*

The purpose of the Forest Practice Act is to regulate the use of timberlands to ensure their productivity while also "giving consideration to values relating to sequestration of carbon dioxide, recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment." (§ 4513; see also § 4514, subd. (c).)  These purposes are accomplished by regulating timber operations during industrial timber harvests (§§ 4581–4592), management of nonindustrial timberlands (§§ 4593–4594.7), and conversion of timberlands to other uses (§§ 4621–4628).

Consistent with its purposes, the Forest Practice Act defines timberlands more broadly than does the Timberland Productivity Act and thus has a broader application. Under the Forest Practice Act (with exceptions not relevant here), timberland is land that "is *available for, and capable of,* growing a crop of trees of a commercial species used to produce lumber and other forest products . . . ." (§ 4526, italics added; see also FP Rules, rule 895.1 [defining timberland by reference to § 4526].)  That is, the Forest Practice Act defines land as timberland according to its *potential* for timber growing.

The Forest Practice Act regulates the use of timberlands primarily by requiring THP's before any timber operations occur.  (§ 4581.)  Timber operations are defined as "the cutting or removal, or both, of timber or other solid wood forest products . . . from timberlands for commercial purposes, together with . . . incidental work . . . ." (§ 4527, subd. (a)(1); see also FP Rules, rule 895.1 [defining timber operations by reference to § 4527].)  Commercial purposes are defined as "(A) the cutting or removal of trees that are processed into logs, lumber, or other wood products and offered for sale, barter, exchange, or trade, or (B) the cutting or removal of trees or other forest products during the conversion of timberlands to land uses other than the growing of timber that are subject to Section 4621 [(requiring an application for a conversion permit)] . . . ."

4

(§ 4527, subd. (a)(2).)  Timber operations are exclusively regulated by the Department, except that counties may regulate timber operations on non-TPZ parcels of less than three acres.  (§ 4516.5, subds. (d), (f).)

The Forest Practice Rules define timberland conversion as "transforming timberland to a nontimber growing use through timber operations where:  [¶] (A) Future timber harvests will be prevented or infeasible because of land occupancy and activities thereon; or [¶] (B) Stocking requirements of the applicable district forest practice rules will not be met within five years after completion of timber operations; or [¶] (C) There is a clear intent to divide timberland into ownerships of less than three acres (1.214 ha.)." (FP Rules, rule 1100(g)(1).)  The Department regulates timberland conversions through permit and THP requirements.  No conversion operations may take place until a timberland conversion permit is issued and recorded, unless an exemption applies. (§§ 4621, subd. (a), 4627; FP Rules, rules 1102, 1103, 1103.1(a), 1104.)  THP's are also generally required for removal of trees during timberland conversions.  (§ 4622 ["[e]xcept as provided in Section 4584, all timber shall be cut pursuant to an approved conversion pursuant to Section 4581"]; FP Rules, rules 1103.1(b), 1106.2; see § 4625 [approval of conversion permit "authorize[es] the applicant to cut and remove any and all trees, provided that [the applicant] otherwise complies with this chapter"].)

One exemption from the conversion permit requirement is for subdivision development of non-TPZ timberlands.  (§ 4628, subd. (b); FP Rules, rules 1104, 1104.2.) For the exemption to apply, local authorities must have approved a tentative subdivision map and granted required use permits and other approvals for the development, and the property owner must have filed a "Notice of Exemption from Timberland Conversion Permit for Subdivision" with the Department.  (FP Rules, rule 1104.2, subds. (a)–(c).) Although a timberland conversion permit is then not required, the property owner must still comply with the THP requirement if timber operations are planned.  (FP Rules, rule 1104.2(d).)

C.       *Big Creek/Santa Cruz*

In *Big Creek/Santa Cruz*, the Supreme Court stated that local land use regulation could possibly make land not available for timber growing within the meaning of the Forest Practice Act definition of timberland.  (*Big Creek/Santa Cruz, supra,* 38 Cal.4th at p. 1155.)  The issue before the court was not whether certain land parcels were timberland under the Forest Practice Act; the issue was whether county land use regulations that restricted timber harvesting in certain areas violated section 4516.5, subdivision (d) (section 4516.5(d)), which prohibits counties from regulating the conduct of timber operations.  (*Big Creek/Santa Cruz,* at pp. 1145–1147.)  The court held that section 4516.5(d) barred counties from regulating *how* timber operations are conducted, but not *where* they are conducted.  In reaching this conclusion, the court observed that several features of the state forestry statutory scheme implicitly recognized that counties retained their traditional zoning powers except where expressly preempted.  (*Big Creek/Santa Cruz,* at pp. 1151, 1153–1154, 1162.)  As one part of this statutory interpretation analysis, the court reasoned that the lumber company's contrary reading of section 4516.5(d) would improperly render certain language in the Forest Practice Act's definition of timberland surplusage:  " '[T]imberland' means 'land . . . which is available for, and capable of, growing a crop of trees . . .' [(§ 4526)].  The phrase 'available for' would be superfluous if the definition were read to include *any* land that is capable of growing qualified trees, but that is what plaintiffs implicitly urge by suggesting that section 4516.5(d) displaces counties' traditional power to declare which parcels among all those capable of growing trees are available for timbering."  (*Big Creek/Santa Cruz,* at p. 1155.)

JHP and amici curiae[3] rely on this passage to argue that Del Norte County's land use regulations render JHP's parcels nontimberland as a matter of law.

------

[3] By order of September 28, 2012, we granted the application of the Pacific Legal Foundation, County of Del Norte, Del Norte Association of Realtors, and California Association of Realtors to appear as amici curiae on behalf of JHP.

II. PROCEDURAL BACKGROUND

A. *The Petition*

JHP filed a traditional mandamus action pursuant to Code of Civil Procedure section 1085 against three employees of the Department, alleging they failed to carry out certain ministerial duties with respect to the two parcels of JHP property at issue here.

The petition states that JHP owns property known as the "Burtschell Subdivision" (Burtschell Parcel)[4] in Del Norte County. The Burtschell Parcel has a general plan designation of "Rural Residential" and a zoning designation of "Rural Residential Agriculture" with a minimum two-acre lot size. The petition further alleges, "Commercial logging is neither a principally permitted nor a use permitted with a conditional use permit in this zone." The county general plan, which was adopted in January 2003, sets land planning goals that include inter alia conservation of forest resources and housing development. In September 2006, the county planning commission approved a subdivision development on the property following "a full [CEQA] environmental review."

JHP also alleges that it owns property known as the "Bay Meadows Subdivision" (Bay Meadows Parcel; jointly with the Burtschell Parcel, JHP Parcels)[5] in Del Norte County. The Bay Meadows Parcel has a general plan designation of "Suburban Residential with 2 units/acre. The Zoning Designation is Planned Community (PC) – Coastal. Commercial logging is neither a principally permitted nor a use permitted with a conditional use permit in the zone." In October 2008, the county planning commission approved a subdivision development on the property following "a full CEQA environmental review" and California Coastal Commission approval.

---

[4] We refer to this real property as the Burtschell Parcel to more clearly distinguish it from the subdivision project that was approved by the county planning commission, which we reference as the Burtschell Subdivision Project.

[5] For the reasons stated in footnote 4, we refer to the real property as the Bay Meadows Parcel and the subdivision project that was approved by the county planning commission as the Bay Meadows Subdivision Project.

JHP contends that Department employees Japp and Savona impermissibly characterized the JHP Parcels as timberland. JHP alleges that the Forest Practice Act definition of timberland refers to land available for (and capable of) growing timber for harvest " 'on a large scale.' " "Given the County of Del Norte's general plan and zoning designations for the [JHP Parcels] for housing, the designation of other areas for commercial timber growth[,] and the approval of these subdivisions for housing, neither of these properties [is] *available for* the growing of a commercially harvested crop of trees because dense housing is not a use compatible with commercial forestry." (Italics added.) JHP asserts that Japp and Savona had a ministerial duty to "follow the statutory definition of Timberlands" and not classify the JHP Parcels as timberland.

JHP submitted a proposed THP for the Burtschell Subdivision Project (Burtschell THP). JHP alleges that Department Deputy Chief Markham, in her review of the Burtschell THP improperly required duplicative environmental review, in violation of CEQA. JHP alleges that state law "prohibit[s] . . . serial review of the project[']s potential impacts on the environment. Nevertheless, in proceeding with [the Burtschell THP, Markham] has ignored these requirements, . . . [and] matters fully and previously reviewed under prior CEQA processes conducted by Del Norte County are impermissibly being further reviewed" in violation of section 21166 and California Code of Regulations, title 14, section 15162. Moreover, the county's 2003 adoption of its general plan included a full CEQA review of the general plan's potential environmental impacts. JHP alleges Markham had a mandatory duty under state law to accept and follow the county's prior environmental review of the Burtschell Subdivision Project's environmental impacts.

B.    *Motion for Judgment on the Pleadings*

The Department, on behalf of the individual employee respondents, moved for judgment on the pleadings. As to the cause of action against Japp and Savona, the Department argued that state law clearly establishes that local authorities cannot interfere with state regulation of timber operations through zoning actions. (See § 4516.5(d).) Therefore, "[a]lthough the County may have zoned the parcels for residential purposes,

8

the parcels were, and still are, available for and capable of growing a crop of trees until the *conversion* to residential housing is *legally completed*." (Italics added.) *Big Creek/Santa Cruz* was inapposite because "[i]t is the *conduct* of timber operations . . . that is at issue here, not the location of permissible timber operations." (Italics added.) The county's alleged zoning restriction on "commercial logging" was irrelevant because timber operations include the cutting and removal of timber not only for sale but also for the conversion of timberland to nontimberland uses, including residential use, and JHP had not shown that such timber operations were prohibited. (§ 4527, subd. (a)(2).) Moreover, if residential zoning alone removed land from Department jurisdiction, the Forest Practice Act would become useless: "Developers would be able to convert timberland to residential and commercial developments without scrutiny [by the Department]. . . . This invalidates the purpose of the Forest Practice Act to restore, enhance, and maintain the productivity of timberlands and to give consideration to values relating to recreation, watershed, wildlife, range and forage, and fisheries. ( . . . § 4513.)"

As to the cause of action against Markham, the Department argued that CEQA provisions barring serial environmental review were irrelevant to its review of a THP: "In its review of the Burtschell [THP], [the Department] is not a lead or responsible agency because it was not and is not responsible for carrying out or approving the environmental impact reports for the General Plan or the development of the parcels. . . . The review of the [THP] is governed by . . . statutes and regulations that are separate and distinct from those that govern environmental impact reports for general plan and residential housing development approval. Here, compliance with both CEQA and the Forest Practice Act are required."

JHP made the following offer of proof with respect to its cause of action against Markham. The county's CEQA review of the Burtschell Subdivision Project included review of the subdivision's road designs, drainage systems, lot configuration, building envelopes, sewage disposal capacity, and effect of inducing further residential growth. The Department intended to again review these aspects of the project as part of the THP review process. Nevertheless, only one segment of one road on the property would be

9

used for logging and that use would be temporary; only 12 trees would be removed from the property; trees would be removed only for the purpose of building houses and roads; the removed trees would not be sold but would be left in place or given away as firewood; and apart from the removal of those 12 trees, "the volume and quality of the trees on those properties would not justify any commercial logging." JHP further represented that the Burtschell THP review process had been pending for approximately four years, as of 2011, and was still not complete: the Department "has presided over a totally and complete[ly] broken process, which is just what the prohibition of serial review sought to avoid."

C. *Trial Court Decision*

The trial court held that *Big Creek/Santa Cruz, supra,* 38 Cal.4th 1139 was distinguishable because the question there was the proper interpretation of section 4516.5(d) (the restriction on county regulation of timber operations), not section 4526 (the definition of timberland), and (2) the ordinances under review in *Big Creek/Santa Cruz* did not convert a particular parcel of land from a timberland use to a nontimberland use. "In the case at bar, in sharp contrast [to *Big Creek/Santa Cruz*], [JHP]'s property has historically been timberland, and trees have been present and available for harvest. Indeed, trees must be harvested in order for [JHP] to develop the residential subdivision. [¶] . . . [¶]

"The way to harmonize the different provisions of the [Forest Practice Act] and the language of *Big Creek*[*/Santa Cruz*] as they apply to the facts of this case is to recognize that lands that have historically been zoned in such a way as to prohibit timber operations are unavailable for timber operations and therefore not 'timberland.' However timberland, such as involved in this case, that is subsequently re-zoned for residential use that will no longer be available for timber operations nevertheless remains subject to [Department] jurisdiction and the requirement for a [THP] throughout the process of converting the timberland to another land use consistent with section 4527. To apply *Big Creek*[*/Santa Cruz*] as [JHP] suggests in this case would not only make the conversion language of section 4527 surplusage . . . but it would open a large unintended void in the

10

regulation of timber harvests. As explained above, counties cannot regulate 'timber operations' and presumably have no mechanisms in place similar to THPs to regulate the process of harvesting trees not designated as timberland. . . . [¶] To follow the logic of [JHP's] argument would allow counties to zone away the jurisdiction of [the Department] and open a gap in the regulation of timber harvesting that the Legislature has not considered or approved. Such a gap does not make sense when considered in relation to the comprehensive regulatory scheme that the Legislature enacted through the [Forest Practice Act]. See *Industrial Risk Insurers v. Rust Engineering Co.* (1991) 232 Cal.App.3d 1038 (statute should be interpreted to effectuate apparent purpose and to harmonize with other sections on same subject). [¶] . . . [¶]

". . . [JHP] has not shown any specific ministerial duty which the [Department has] failed to perform. In this case the court has determined that [the Department's] interpretation of the [Forest Practice Act] is correct, and that [it has] no duty to accept a county's rezoning as depriving [the Department] of jurisdiction for timber harvests during a conversion process. [¶] . . . [¶] . . . [JHP] cannot cure its pleading in this regard as a matter of law."

### III. DISCUSSION

A motion for judgment on the pleadings "is equivalent to a demurrer and is governed by the same standard of review. All material facts that were properly pleaded are deemed true, but not contentions, deductions, or conclusions of fact or law. If leave to amend was not granted, we determine whether the complaint states a cause of action and whether the defect can reasonably be cured by amendment. If the pleading defect can be cured, the trial court committed reversible error. If not, we affirm. The plaintiff bears the burden of proof on this issue. Finally, the judgment will be affirmed if it is proper on any grounds raised in the motion even if the court did not rely on those grounds. [Citation.] [¶] In addition to the facts pleaded, we may consider matters that may be judicially noticed, including a party's admissions or concessions which cannot reasonably be controverted. [Citation.]" (*Pang v. Beverly Hospital, Inc.* (2000) 79 Cal.App.4th 986, 989–990.)

11

"[A motion for judgment on the pleadings] does not admit the truth of argumentative allegations about the legal construction, operation, and effect of statutory provisions; similarly, it does not admit the truth of allegations that challenged actions are arbitrary and capricious or an abuse of discretion. [Citation.]" (*Building Industry Assn. v. Marin Mun. Water Dist.* (1991) 235 Cal.App.3d 1641, 1645 (*Building Industry Assn.*).)

A writ of mandate may be issued "by any court to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station. . . ." (Code Civ. Proc., § 1085, subd. (a).) "To obtain writ relief, a petitioner must show: ' "(1) A clear, present and usually ministerial duty on the part of the respondent . . . ; and (2) a clear, present and beneficial right in the petitioner to the performance of that duty . . . ." [Citation.]' 'Although mandate will not lie to control a public agency's discretion, that is to say, force the exercise of discretion in a particular manner, it will lie to correct abuses of discretion. [Citation.] In determining whether an agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.]' [Citation.]" (*Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 335–336; see also *Building Industry Assn., supra,* 235 Cal.App.3d at pp. 1645–1646 [mandate is not available to compel the exercise of discretion by a public body or official in a particular manner or to reach a particular result].)

A.      *Japp and Savona:  Timberland Designation*

The Department insisted that JHP was required to comply with the use conversion requirements of the Forest Practice Act for non-TPZ timberland before engaging in timber operations, i.e., removing trees from the JHP Parcels. JHP argues Japp and Savona had a ministerial duty to treat the JHP Parcels as nontimberland because the parcels' zoning and general plan designations made the lands not available for large-scale commercial logging. The trial court held that historical timberlands become not available for timber growing within the meaning of the Forest Practice Act definition of timberland

12

only when there is an actual change in use of the land that is incompatible with timber growing, i.e., when a conversion occurs.

      1.     *Trial Court Record*

The parties made factual representations in the trial court (and JHP made an offer of proof) about the historical, current and potential uses of the JHP Parcels and they do so again on appeal, now joined by amici curiae. Moreover, the trial court's decision recites, and appears at least in part to be based on, the historical use of the parcels and the timing of the conversion process through the land use designations for the parcels. JHP's ministerial duty argument, however, does not turn on the historical use of the parcels, their actual use just prior to commencement of the subdivision development, or their physical potential or capacity for timber growing on any particular scale. JHP argues that the local land use designations affecting the parcels at issue here necessarily render the land nontimberland.

To clarify the record and the issues before us, we review the state of the trial court record, which includes matters judicially noticed below. We find that certain facts cited in the trial court's decision lack foundation in the record. We conclude, however, that these facts are ultimately not dispositive of the appeal.

      a.     *Historical Use of the Parcels*

The Department asserted in the trial court that the JHP Parcels were "historical timberland," and the trial court recited that fact in its decision. The Department now argues it is undisputed that the parcels are historic timberlands and this court should assume that fact in deciding this appeal. We conclude there is no support in the record for this finding.

The Department asked the trial court to take judicial notice of certain parts of the Burtschell THP. Included was a county staff report that was prepared in connection with JHP's application for county approval of the Burtschell Subdivision Project. The Department quoted the staff report's statement that the Burtschell Parcel had "historically been logged" and argued, "There is [therefore] no question that before the rezoning to residential this property was 'timberland' and subject to the requirements of the [Forest

13

Practice Act]." JHP, however, opposed the request for judicial notice and the trial court expressly declined to take judicial notice of the THP or its attachments.

The Department also asked the trial court to take judicial notice of a related administrative mandamus petition (Code Civ. Proc., § 1094.5), which was filed by Henry Westbrook, the sole member of JHP, challenging civil penalties imposed by the Department for unauthorized timber operations on property including the JHP Parcels (Case No. CVPT09-1441).[6] Although less than entirely clear, it appears the Department actually sought judicial notice of the administrative law judge's findings in those administrative proceedings. The Department alludes to those findings on appeal when it writes, "To prepare the historic timberlands for residential development, JHP undertook significant work, including building roads, excavating, clearing and removing trees. JHP performed this work without first obtaining permits and approvals from [the Department]." The trial court, however, implicitly denied the Department's request for judicial notice of this petition when it expressly granted judicial notice only of other matters that were included in the same request, a county ordinance and one section of the county general plan.[7]

In sum, JHP's petition did not allege that its parcels were historic timberlands and the court did not take judicial notice of any such fact. In our analysis, we cannot assume that the JHP Parcels are historic timberlands.

---

[6] The Department's motion for judgment on the pleadings requested, in the alternative, consolidation of the two petitions.

[7] The Department requested judicial notice under Evidence Code section 452, subdivision (d), presumably as "[r]ecords of . . . any court of this state." (Evid.Code, § 452, subd. (d)(1).) However, a court may not take judicial notice of the truth of any factual assertions appearing in the documents. (*Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1396 ["[w]e can take judicial notice of the fact the pleadings were filed, but not of the truth of the statements contained in them"].) Moreover, a court may not take judicial notice of the *truth* of a factual finding made in another action. (*Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 484.) The trial court properly declined to consider such matters.

b.    *"Recent" Rezoning*

The trial court wrote, "At [JHP's] request the [JHP Parcels] were *recently rezoned* by the County to residential use and [JHP] intends to develop separate subdivisions on the properties." (Italics added.)  Citing the trial court decision, the Department states on appeal it is factually undisputed that, "[a]t JHP's request, the County re-zoned the property to residential use so that JHP could subdivide and develop the properties." Again, JHP's petition does not so allege and the assertion appears unsupported by anything we can find in the record.  The only dates provided in the petition for relevant county land use actions are (1) the 2003 adoption of the county's current general plan; (2) the 2006 county approval of the Burtschell Subdivision Project; and (3) the 2008 county approval of the Bay Meadows Subdivision Project.  The trial court also took judicial notice of a county ordinance and one section of the county general plan, but those enactments do not establish recent rezoning of the parcels in question.[8]  We therefore cannot assume that the JHP Parcels were only recently rezoned for residential use.

2.    *Relevance of Historical Use and Rezoning*

On appeal, JHP argues such factual disputes must be resolved, and that judgment on the pleadings is therefore inappropriate.  JHP is correct that a motion for judgment on the pleadings, like a demurrer " 'is simply not the appropriate procedure for determining the truth of disputed facts.' [Citation.]" (*Joslin v. H.A.S. Ins. Brokerage* (1986) 184 Cal.App.3d 369, 374.)  But we do not find the resolution of these matters necessary to the questions presented on this appeal.  JHP's petition does not urge that the Department abused its discretion in its consideration or application of the historical facts.

---

[8] Amici curiae represent that "both parcels at issue have been zoned for residential development since at least the late 1970s."  To support this statement, amici curiae improperly cite to a trial court document that is not in the appellate record.  Amici curiae also ask us to take judicial notice, inter alia, of a county zoning map.  We deny this request for judicial notice because we conclude the timing of the rezoning is ultimately not relevant to our analysis.  (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [only relevant material is a proper subject of judicial notice], overruled on other grounds in *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276.)

15

JHP's pleading position was premised on its contention that the Department had *no* discretion to exercise because the JHP Parcels are not timberland as a matter of law by virtue of local land use designations.  We disagree.

> 3.  *The Forest Practice Act Definition of Timberland*

The Forest Practice Act and Forest Practice Rules define timberland broadly. Timberland is land "which is available for, and capable of, *growing a crop of trees of a commercial species . . . .*"  (§ 4526, italics added.)  Commercial species are identified by regulation.  (FP Rules, rule 895.1.)  A crop of trees is defined by regulation as "*any number of trees* which can be harvested commercially."  (*Ibid.,* italics added.) Timberland, therefore, is land that is available for and capable of growing any number of trees of a commercial species "which can be harvested commercially."  No regulation defines "trees which can be harvested commercially."

> a.  *"Commercially"*

JHP's petition alleges that "commercially" means "the exchange or buying and selling of commodities *on a large scale*."[9]  (Italics added.)  It quotes a dictionary definition of "commerce" (*Merriam-Webster Dictionary* <http://www.merriam-webster.com/dictionary/commerce> [as of April 19, 2013]); however, the same dictionary's definition of "commercial" indicates that "viewed with regard to profit" is as likely a meaning as "designed for a large market" (*id.* at <http://www.merriam-webster.com/dictionary/ commercial> [as of April 19, 2013]).

A more relevant source of guidance for the meaning of the term "commercially" as used in the timberland definition is the Forest Practice Act's other uses of similar term in similar contexts.  (*People v. Burns* (1997) 53 Cal.App.4th 1171, 1175 ["[i]t is presumed, in the absence of anything in the statute to the contrary, that a repeated phrase or word in a statutory scheme is used in the same sense throughout"].)  The Forest

---

[9] Consistent with this approach, JHP refers to timber operations within the Department's jurisdiction as "commercial logging" and "commercial timber production," which connotes timber harvesting on a large, industrial scale.  Amici curiae similarly use the term "commercial timber harvesting."

Practice Act defines timber operations as "the cutting or removal, or both, of timber or other solid wood forest products . . . from timberlands *for commercial purposes*, together with all the incidental work . . . ." (§ 4527, subd. (a)(1), italics added.) Commercial purposes are defined as "(A) the cutting or removal of trees that are processed into logs, lumber, or other wood products and offered for sale, barter, exchange, or trade, or (B) the cutting or removal of trees or other forest products during the conversion of timberlands to land uses other than the growing of timber that are subject to Section 4621 [requiring an application for a conversion permit] . . . ." (§ 4527, subd. (a)(2).) By its plain language, the first definition is not dependent on any particular scale of operations. Any number of trees that are cut or removed, processed into wood products, and sold or exchanged are cut or removed for commercial purposes. Under the second definition, there need not even be any anticipated wood product processing or sale or exchange of timber for the cutting or removal of trees to have a commercial purpose: the commercial purpose comes from the anticipated nontimber-growing use of the property following conversion. The Forest Practice Act definition of timber operations, therefore, supports an interpretation of "commercially" in its definition of timberlands to mean "for profit," regardless of scale.[10]

Similarly, the regulatory definition of a crop of trees strongly indicates that large scale operations are not required: a crop of trees is "*any number* of trees that can be harvested commercially." (FP Rules, rule 895.1, italics added.)

We find additional guidance in the Legislature's use of *different* language to define timberland in the Forest Practice Act and the Timberland Productivity Act. As noted, the Timberland Productivity Act defines timberland in part according to a land parcel's commercial capacity: the parcel must be "capable of growing an average annual

---

[10] The Department argues, "Obviously, if trees and wood products are being cleared, cut, or removed by JHP to prepare the properties for development, the land is both available for and capable of growing a crop of trees. . . . [*T*]*here is no requirement that the trees be merchantable . . . .*" (Italics added.) We understand the Department to be referring to the second definition of timber operations for commercial purposes, which applies to conversions of timberland.

volume of wood fiber of at least 15 cubic feet per acre." (Gov. Code, § 51104, subd. (f).) The Legislature did not use such language in the Forest Practice Act. Instead, it adopted a standard amenable to broad interpretation: the land need only be "capable of growing a crop of trees of any commercial species." (§ 4526.) As noted, the Forest Practice Rules in turn defines a crop of trees almost as broadly as possible: "*any number* of trees which can be harvested commercially." (FP Rules, rule 895.1.) Given the expansive language used by the Legislature and the regulation, we cannot accept JHP's argument that "commercially" in the Forest Practice Act definition of timberland indicates large-scale operations. (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 ["[o]rdinarily, where the Legislature uses a different word or phrase in one part of a statute than it does in other sections or in a similar statute concerning a related subject, it must be presumed that the Legislature intended a different meaning"].)

   b.   *"Capable of"*

JHP and amici curiae do not expressly dispute that the JHP Parcels are capable of growing a crop of trees of a commercial species that can be harvested commercially. However, they make a number of arguments suggesting it would be absurd to treat the JHP Parcels as timberland because they bear few if any trees. As noted *ante*, facts about the current physical condition of the parcels are not properly before us. We further conclude that such facts are not relevant to whether the parcels are *capable of* (or *available for*) the growing of a crop of trees.

We understand "capable of" to refer to the physical potential of the land, i.e., its ability to grow such trees. "Available for" similarly alludes to a parcel's potential: it suggests present conditions that *allow for* timber growing, even if timber growing is not a current activity. Neither of these terms refer to a parcel's actual or current use. If there is doubt on this point, it is dispelled by a comparison to the definition of timberland in the Timber Productivity Act, which expressly turns on a parcel's actual use. (Gov. Code, § 51104, subd. (f) [timberland is defined in part as land that is "devoted to and used for growing and harvesting timber"].) If the Legislature had intended timberland under the Forest Practice Act to include only land that was actually devoted to the growing of

18

timber for commercial harvest, it knew how to write such a definition. It chose not to do so. (See *Campbell v. Zolin, supra,* 33 Cal.App.4th at p. 497.)

JHP writes that "growing a commercially harvestable crop of trees on the lots in Burtschell and Bay Meadows is factually not an available activity . . . because of . . . [inter alia] a lack of any significant number of trees that could be cut." The absence of any significant number of trees, however, does not make land incapable of or unavailable for growing new trees, including a sufficient number to constitute a crop of trees that can be commercially harvested.

JHP further argues that, under the Department's interpretation of the timberland definition, "land containing as little as a single sapling" is timberland, which would be absurd. "Under the [Forest Practice Act] the [Department is] supposed to manage *actual* timber growing lands to protect and preserve them for *actual* timber growing values." (Italics added.) Similarly, amici curiae argue it would be absurd if land that "was never re-seeded after logging and hence contains no trees"—i.e., "barren land"—and that has been zoned residential was deemed timberland and subject to the jurisdiction of a forestry department. We see no conflict between the purposes of the Forest Practice Act and the broad reach of the timberland definition, which is consistent with the act's goal of ensuring an adequate supply of timberland, both for harvesting and for wildlife preservation, aesthetic enjoyment, recreational opportunities, and similar purposes. Managing the recovery of timberlands that have been harvested is central to the statutory scheme, which expressly sets stocking standards on logged timberlands. (See §§ 4561, 4561.1, 4561.5, 4561.7; FP Rules, rules 1070–1085.6.)

It may be that the Department's exercise of jurisdiction over land that *literally* is available for and capable of growing a crop of trees but whose preservation would not further the goals of the statutory scheme—such as a lot in an urban environment that bears no trees[11]—might be a prejudicial abuse of the discretion in context. But that is not

_____

[11] Amici curiae, for example, raise a hypothetical of a parcel of "land in fully developed, urban areas replete with houses, office buildings, department stores, and every

19

the case before us.  JHP does not allege in its petition that the Department abused its discretion in its exercise of jurisdiction over the JHP Parcels based on peculiar characteristics of those parcels; rather, it alleges the Department had a *ministerial duty* to treat the parcels as nontimberland as a matter of law by virtue of the applicable local land use regulations alone.

      c.    *"Available for":  Guidance from Conversion Provisions*

We now come to the crux of the appeal:  are the JHP Parcels "available for" growing a crop of trees of a commercial species?

"Available for" is not defined by statute or regulation.  The phrase connotes present circumstances, but offers no guidance itself as to whether those circumstances include current local land use regulations, actual current uses of the parcel, or other factors.

One obvious source of guidance for the meaning of timberland (i.e., land that is available for growing a crop of trees) is the Forest Practice Act's description of how timberlands are transformed into nontimberland—i.e., the conversion provisions of the statutory scheme.  As noted *ante*, a Forest Practice Rule defines timberland conversion as "transforming timberland to a nontimber growing use through timber operations where: [¶] (A) Future timber harvests will be prevented or infeasible because of land occupancy and activities thereon; or [¶] (B) Stocking requirements of the applicable district forest practice rules will not be met within five years after completion of timber operations; or [¶] (C) There is a clear intent to divide timberland into ownerships of less than three acres (1.214 ha.)."  (FP Rules, rule 1100(g)(1).)  In other words, parcels are devoted to nontimber growing uses under this regulation where (1) the actual use of the land becomes incompatible with timber harvesting; (2) the actual use of the land prevents satisfaction of Forest Practice Act stocking requirements, or (3) the land is subdivided into parcels of less than three acres and the Department therefore loses its exclusive

---

other mainstay of urban living . . . [whose] underlying soil" was capable of growing a crop of trees.

jurisdiction over the conduct of timber operations on the land. (See § 4516.5, subd. (f).) In all of these circumstances, the change in use of the land is such that timber harvesting on the land can no longer reliably be regulated consistent with Forest Practice Act standards.

It is these changes in use that impliedly convert or transform what may otherwise be timberland into nontimberland. That is, they render land no longer available for growing a crop of trees that can be harvested commercially, even if the land is still literally capable of growing a crop of trees. Lands that cannot be restocked according to Forest Practice Act standards, for example, might still be capable of growing a crop of trees. Thus, at least one meaning of "available for" appears to be that the present *use* of the parcel allows for growing a crop of trees. The conversion process is triggered when that use changes and becomes incompatible with growing such trees. The Forest Practice Act and its regulations expressly confer jurisdiction on the Department to regulate the conversion process. (§§ 4621–4628.) Therefore, Japp and Savona did not violate any ministerial duty when they treated the parcels as timberlands.

     d.     *"Available For": Guidance from* Big Creek/Santa Cruz

JHP and amici curiae argue that "available for" also means the parcel must be *zoned* for uses compatible with timber growing. They rely on what is arguably dicta in *Big Creek/Santa Cruz* that says local zoning could render certain land unavailable for timber growing within the meaning of the Forest Practice Act definition of timberland.

The issue before the Supreme Court in *Big Creek/Santa Cruz* was whether two local zoning ordinances were preempted by the Forest Practice Act because they improperly regulated the conduct of timber operations in violation of section 4516.5(d). (*Big Creek/Santa Cruz, supra,* 38 Cal.4th at pp. 1145–1147, 1150–1151.) The local ordinances at issue restricted timber harvesting[12] to certain zoned districts, barred

---

[12] The text of the ordinances is not included in the *Big Creek/Santa Cruz* opinion. (*Big Creek/Santa Cruz, supra,* 38 Cal.4th 1139.) Therefore the extent that the ordinances restricted the growing of a crop of trees on affected land within the meaning of the Forest Practice Act definition of timberland (§ 4526) cannot be discerned. The issue was not

21

harvesting in certain areas adjacent to streams and residences, and limited the areas where helicopter operations associated with timber harvesting could occur. (*Ibid.*) Importantly, nothing in the opinion indicates that the ordinances *prohibited* (i.e., made parcels not available for) the growing of a crop of trees of a commercial species within the meaning of the Forest Practice Act definition of timberland. The lumber company argued that the ordinances nevertheless violated section 4516.5(d)—which provides that counties shall not "regulate the conduct of timber operations . . . or require the issuance of any permit or license for those operations" except on parcels of less than three acres—because they *regulated* timber operations. (*Big Creek/Santa Cruz*, at pp. 1150–1151.) The court concluded that section 4516.5(d) prohibits counties from regulating *how* timber operations occur ("the 'conduct' of timber harvesting operations"), not *where* they occur, and held the Santa Cruz ordinances were not preempted because they merely regulated where timber operations occurred.[13] (*Big Creek/Santa Cruz,* at pp. 1151, 1162.)

As explained *ante*, the Supreme Court observed that several features of the state forestry statutory scheme implicitly recognize that counties retain their traditional zoning power and reasoned that the lumber company's reading of section 4516.5(d) would improperly render part of the Forest Practice Act's definition of timberland surplusage: " '[T]imberland' means 'land . . . which is available for, and capable of, growing a crop

---

directly relevant to the question before the court, which was whether the county regulated the conduct of timber operations *at all* and thus violated section 4516.5(d).

[13] The Supreme Court expressly adopted much of the analysis in a decision of this court, *Big Creek Lumber Co. v. County of San Mateo* (1995) 31 Cal.App.4th 418, 428 (*Big Creek/San Mateo*). (*Big Creek/Santa Cruz, supra,* 38 Cal.4th at pp. 1151–1154, 1157, 1159–1160.) In *Big Creek/San Mateo*, Division Three considered a county ordinance that prohibited most commercial timber harvesting on non-TPZ land within a certain distance of a legal dwelling. (*Big Creek/San Mateo*, at p. 422.) The court held that the ordinance did not run afoul of section 4516.5(d) because the county was regulating *where* the timber operations occurred not *how* they were conducted. The court also relied heavily on the fact that other provisions of the Timberland Productivity Act and the Forest Practice Act recognize that local governments retain their zoning authority except as expressly preempted by those state laws. (*Big Creek/San Mateo,* at pp. 424–426.)

22

of trees . . .' [(§ 4526)]. The phrase 'available for' would be superfluous if the definition were read to include *any* land that is capable of growing qualified trees, but that is what plaintiffs implicitly urge by suggesting that section 4516.5(d) displaces counties' traditional power to declare which parcels among all those capable of growing trees are available for timbering." (*Big Creek/Santa Cruz,* at p. 1155.)

The quoted passage, which is the primary foundation on which JHP's appellate arguments rest, appears to be dicta. The Supreme Court cited the timberland definition as merely one example of a pattern in the statutory scheme that preserved local zoning authority to the maximum extent compatible with the Department's mandate to regulate timberlands and timber operations. The timberland definition makes no explicit reference to local zoning authority and thus was not critical to the court's analysis. Nevertheless, "statements of the California Supreme Court should be considered persuasive even if properly characterized as dictum. [Citations.]" (*Thurman v. Bayshore Transit Management, Inc.* (2012) 203 Cal.App.4th 1112, 1147.) Generally speaking, it is advisable for trial courts and intermediate appellate courts to follow Supreme Court dicta. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1168–1169.)

But the Supreme Court had no occasion in *Big Creek/Santa Cruz* to consider the scope of local zoning authority in the context presented in this appeal, or the consequences of the interpretation that JHP and amici curiae urge. As the trial court correctly observed, such an interpretation would leave a significant gap in the regulation of timberlands under the Forest Practice Act.[14] A local government could rezone a

_____

[14] The trial court attempted to harmonize the *Big Creek/Santa Cruz* language with the Department's express conversion authority by ruling that the *Big Creek/Santa Cruz* language applied to land that was not historic timberland (i.e., property historically used for timber harvesting), whereas the conversion provisions applied to historical timberlands. However, we see no support for this distinction in the statutory or regulatory language. Timberland is not defined by a parcel's historical use. (Cf. Gov. Code, § 51104, subd. (f) [timberland defined in Timberland Productivity Act in part by actual use for timber growing and harvesting].) Nor is the definition of timberland conversion confined to historic timberland. In our view, the plain language of the statutory scheme indicates that the Legislature intended all timberland (i.e., land

23

forested area as a residential zone, outlaw timber harvests in that area, and then approve subdivision developments on the property without Department involvement, arguing the land already became nontimberland by virtue of the zoning and the subdivision projects were thus not transforming timberland to a nontimber growing use.[15] The Supreme Court did not consider whether the "available for" language alone in the statutory scheme grants local governments the power unilaterally to remove land from the Department's jurisdiction before the land is actually converted to another use, thus rendering the conversion provisions of the statutory scheme meaningless.

While we think it unlikely that the high court would approve such a result, we conclude that we need not explore or definitively resolve that issue here. JHP has not shown that the land use designations of its parcels make the land unavailable for timber growing within the meaning of the Forest Practice Act definition of timberland. That is, it has not shown that those land use regulations disallow the growing of any number of trees of a commercial species that can be harvested commercially. Most obviously, the regulations clearly do not prohibit the cutting or removal of trees in the process of subdivision development (which the county approved on the JHP Parcels), which the Forest Practice Act defines as "for a commercial purpose." Even setting that meaning of commercial timber growing and harvest aside, JHP has not shown that the regulations make its land not available for timber growing within the meaning of the timberland definition. JHP alleges its parcels are zoned for *minimum* one-half-acre or *minimum* two-acre residential lots. Obviously, lots of much greater size might exist within that zone and trees might be cut or removed from such lots for processing and sale or exchange without substantial interference with nearby residences. Removal of such trees could easily fall outside the restrictions on "commercial logging," which are not defined in the

---

potentially useful for growing timber) to come under the Department's jurisdiction when there is a plan to transform it to a use incompatible with such timber growing.

[15] The Department argues that even if county zoning prohibited the growing of a crop of trees on a parcel, the parcel would remain timberland until existing trees were actually removed from the land in the process of converting it to a different use.

petition. Indeed, the trial court proceedings cast considerable doubt on the extent of those alleged restrictions. The Department alleged in its briefing that no prohibition on timber operations (as defined in the Forest Practice Act) existed and challenged JHP to identify the ordinance, which JHP declined to do even though it made an offer of proof regarding other facts it believed it could establish to prove its case. JHP argues that other areas of the county have been designated as appropriate for "forestry activities." However, that fact does not establish that lands in other land use designations are *not* available for timber growing within the meaning of the timberland definition. Amici curiae note that the county's general plan designates certain parcels "timberland" and others, including the JHP Parcels, "rural residential."[16] However, the general plan's use of the term timberland is not necessarily coextensive with the Forest Practice Act's definition of timberland. Indeed, the section of the general plan cited by amici curiae specifically acknowledges the Department's jurisdiction over the conversion of forestry land for purposes of development, which presumably includes residential development and thus would appear to be possible only in zones designated residential.

Amici curiae argue that the Department's interpretation of timberland would mean that "someone living in the suburbs . . . who wants to cut down a tree in his or her backyard to sell firewood, or even to give firewood to a neighbor in exchange for apples from the neighbor's apple tree, would be engaging in 'timber operations' and therefore [would be] subject to [the Department's] jurisdiction," and implies this would be an absurd result. We are not convinced that this is either a necessary or likely consequence of accepting our broad understanding of the timberland definition. The primary means by which the Department regulates the use of timberland is through its exclusive regulation of timber operations. An exemption to this exclusive jurisdiction applies to parcels of less than three acres. Moreover, the Forest Practice Rules define a timberland conversion to include subdivision of a parcel into lots of less than three acres. This rule certainly

---

[16] We grant amici curiae's unopposed September 19, 2012 request that we take judicial notice of portions of the Del Norte County general plan. (Evid. Code, §§ 452, subd. (b), 459, subd. (a).)

implies that the Department views the subdivision of property for typical residential use as essentially taking property outside of the Department's areas of concern. We also note that growing and removing immature trees for firewood and the cutting and removal of dead, dying or diseased trees are exempt from the THP requirement. (§ 4584, subds. (b), (c).)

Finally, amici curiae argue that recognizing Department jurisdiction over the JHP Parcels threatens the county's achievement of its local land use goals and specifically threatens the county's receipt of state funding for housing construction. However, the mere existence of Department jurisdiction does not impair achievement of any of these goals or plans. The petition does not allege that the Department has denied a THP or otherwise prevented the development of subdivisions on the property; the petition simply alleges that the Department is imposing procedural requirements that JHP contends it should not have to fulfill.

### e. *Conclusion*

In sum, we hold that JHP has not alleged facts establishing that Japp and Savona breached their ministerial duties when they treated the JHP Parcels as timberland within the meaning of the Forest Practice Act.

## B. *Markham: Duplicative Environmental Review*

JHP and amici curiae argue that the Department's review of the Burtschell THP violates CEQA's prohibition on serial environmental review. They also argue the Department should have participated as a responsible agency in the county planning commission's CEQA review of JHP's subdivision projects and cannot belatedly insist on a THP without having done so. We conclude this issue cannot be decided on the pleadings alone and must be remanded to the trial court for further proceedings.

Under CEQA, a lead agency is "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067.) A responsible agency is "a public agency, other than the lead agency, which has responsibility for carrying out or approving a project" (§ 21069). Under ordinary CEQA procedures, responsible agencies must consult with the

26

lead agency while it performs its initial study and prepares an environmental impact report (EIR) or negative declaration. (Cal. Code Regs., tit. 14, § 15096, subd. (b).) Responsible agencies must (1) recommend whether the lead agency should prepare an EIR or negative declaration and provide reasons for the recommendation; (2) if the lead agency prepares an EIR, identify environmental information that would be germane to the responsible agency's statutory responsibilities in connection with the proposed project (which the lead agency must then include in the EIR); and (3) comment on the adequacy of the draft EIR or negative declaration. (*Id.* at § 15096, subds. (b)–(d).) If the responsible agency believes the final EIR or negative declaration is inadequate for the responsible agency's own use, it must take the issue to court within 30 days of the lead agency's filing of a notice of determination, prepare a subsequent or supplemental EIR if permissible under section 21166 (requiring substantial changes in project or circumstances or significant new information; see Cal. Code Regs., tit. 14, §§ 15162– 15164), or assume the lead agency role; otherwise, its objections to the adequacy of the document will be deemed waived. (*Id.* at § 15096, subd. (e).) When reaching its own decision on the project, the responsible agency must (1) consider the lead agency's EIR or negative declaration; (2) adopt any feasible alternatives or mitigation measures that would lessen or avoid significant effects on the environment for the part of the project that is subject to the responsible agency's approval; (3) make relevant CEQA findings; and (4) file a notice of determination. (*Id.* at § 15096, subds. (f)–(i); see generally, 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2012) §§ 3.19–3.23, pp. 123–126.1.)

Regulation of timber harvesting operations under the Forest Practice Act, however, is a certified program within the meaning of CEQA section 21080.5.[17] (Cal.

_____

[17] Section 21080.5 provides that "when the regulatory program of a state agency requires a plan or other written documentation containing environmental information and complying with paragraph (3) of subdivision (d) to be submitted in support of [issuance of a permit], the plan or other written documentation may be submitted in lieu of the environmental impact report required by this division if the Secretary of the Resources

Code Regs., tit. 14, § 15251, subd. (a); *Environmental Protection Information Center, Inc. v. Johnson* (1985) 170 Cal.App.3d 604, 610–611 (*EPIC*).)  Certified regulatory programs are exempt from certain CEQA requirements, including several that set forth the duties of lead and responsible agencies.[18]

Although the phrase "regulation of timber harvesting operations" conceivably could encompasses timberland conversions (which are defined as transformations of timberland "through timber operations"), a leading practice guide on the Forest Practice Act states that "the Secretary for Resources has not certified [the Department's] review and approval of [timberland conversion permits] as a functionally equivalent program under CEQA."  (Duggan & Mueller, Guide to the Cal. Forest Practice Act and Related Laws (2005) p. 426 (Duggan & Mueller).)  Department approval of conversion permits, therefore, is governed by ordinary CEQA procedures, as reflected in the Forest Practice Rules.[19]  On the JHP Subdivision Projects, the county planning commission apparently served as the lead agency and the Department was a responsible agency.  (See Duggan & Mueller, at p. 426 [referring to a Department administrative manual].)

Department approval of a THP, including a THP for conversion operations, falls within the certified regulatory program exception to certain CEQA requirements and the

_____

Agency has certified the regulatory program pursuant to this section."  (§ 21080.5, subd. (a).)

[18] Section 21080.5 exempts certified regulatory programs from CEQA Chapter 3 (§§ 21100–21108), Chapter 4 (§§ 21150–21154), and section 21167, with exceptions not relevant here.  (§ 21080.5, subd. (c).)  The program, however, remains subject to all other provisions in CEQA.  (Cal. Code Regs., tit. 14, § 15250; *EPIC, supra*, 170 Cal.App.3d at pp. 614, 616–618, 620.)

[19] See Forest Practice Rules, rules 1105.2 (requiring consideration of environmental feasibility of conversion), 1106 (requiring approval of conversion permit if Director "makes the written finding pursuant to [§] 21081, if an [EIR] has been prepared"), 1106.4 (requiring denial if Director cannot make same findings); section 21081 (where EIR has identified significant environmental effects, project may be approved only if findings are made about mitigation, alternatives or overriding public benefits); see also section 4622 (if proposed conversion requires local rezoning or a local use permit, Department's approval must be conditioned on the granting of the rezoning or use permit by local authorities).

THP itself serves as an abbreviated substitute for an EIR. (Duggan & Mueller, *supra,* p. 446; § 21080.5, subd. (a); *EPIC, supra*, 170 Cal.App.3d at pp. 609–612; *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1338.) In the THP context, the Department serves as the lead agency. (Duggan & Mueller, at p. 446.) Although the program is exempt from CEQA provisions requiring coordination between lead and responsible agencies (§ 21080.5, subd. (c) [exemption from §§ 21100 et seq. and 21150 et seq.]), the Forest Practice Act imposes its own similar requirements. (Duggan & Mueller, at pp. 447–448 [citing § 4582.6; FP Rules, rules 1037.3, 1037.4, 1037.8].)

In the conversion context, therefore, the Department apparently reviews and approves a conversion permit (if required) under ordinary CEQA procedures, often as a responsible agency, and then separately reviews and approves a THP for timber operations related to the conversion under the Forest Practice Act certified regulatory program for THP's. JHP argues these two environmental reviews are duplicative, at least as actually carried out by the Department if not inherently so. The duplicative review, it argues, violates CEQA provisions that are not covered by the exemptions provided for the certified regulatory program. Specifically, duplicative review violates section 21166, which provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available." " 'Section 21166 is intended to provide a balance against the burdens created by the environmental review process and to accord a reasonable measure of finality and certainty to the results achieved.' [Citation.]" (*Moss v. County of Humboldt* (2008)

29

162 Cal.App.4th 1041, 1057.) Section 21166 applies to the environmental review of "a project" and "project" ordinarily is interpreted broadly to include "the whole of the action" so as to avoid piecemeal review. (*RiverWatch v. Olivehain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1203; Cal. Code Regs., tit. 14, § 15378, subd. (a).)

JHP raises a plausible argument that the Department's review of the Burtschell THP (involving timber operations related to the Burtschell Subdivision Project) was a prohibited subsequent or supplemental environmental review of part of the same CEQA "project" (the Burtschell Subdivision Project) that had already been reviewed by the county planning commission pursuant to CEQA. Therefore, the trial court erred by ruling as a matter of law that JHP could not prevail on his claim that the Department's Burtschell THP review was an improper subsequent review of the county environmental review of the Burtschell Subdivision Project. Relevant factual questions include the scope of the project that was reviewed by the county, the extent of overlap between the county EIR and the Burtschell THP, and the existence of substantial changes or new information that might render further environmental review permissible under section 21166.

## IV.   DISPOSITION

The judgment is reversed in part. The action is remanded for further trial court proceedings consistent with the views expressed in this opinion. Each side shall bear its own costs.

_____
Bruiniers, J.

We concur:

_____
Jones, P. J.

_____
Simons, J.

30